IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION

- - -

RONALD FLEMING,                    : CIVIL ACTION

 Plaintiff,                        : NO. 02-164 Erie

    -VS-                           :

SUPERINTENDENT WOLFE,  et al,:

            Defendants.  :

- - -

Bench trial proceedings held before the Honorable

Magistrate Susan Paradise Baxter, on Tuesday, October 18,

2005, held in Courtroom "B" of the United States Federal

Courthouse, 617 State Street, Erie, Pennsylvania, 16501,

commencing at 9:30 a.m. and concluding at 4:20 p.m.

- - -

For the Plaintiff:

        Ronald Fleming, pro se
        Stilton, Pennsylvania

For the Defendants:

        Kemal A. Mericli, Esquire
        Office of the Attorney General
        6th Floor, Manor Complex
        564 Forbes Avenue
        Pittsburgh, Pennsylvania 15219


            REPORTED BY:  DENICE A. GRILL, RMR
            FERGUSON & HOLDNACK REPORTING, INC.

1                           I N D E X

2    Testimony of RONALD FLEMING:

3         Direct Examination . . . . . . . . . . . . .Pg.  6

4         Cross-examination by Mr. Mericli . . . . . . .Pg. 12

5    Testimony of THOMAS R. WEAVER:

6         Direct Examination by Mr. Fleming . . . . . .Pg. 23

7         Cross-examination by Mr. Mericli . . . . . . .Pg. 32

8         Redirect Examination by Mr. Fleming . . . . .Pg. 43

9         Recross-examination by Mr. Mericli . . . . . .Pg. 42

10        Further Redirect Examination by Mr. Fleming .Pg. 46

11   Testimony of JOHN TILLER:

12        Direct Examination by Mr. Fleming . . . . . .Pg. 48

13        Cross-examination by Mr. Mericli . . . . . . .Pg. 52

14        Redirect Examination by Mr. Fleming . . . . .Pg. 55

15        Recross-examination by Mr. Mericli . . . . . .Pg. 66

16        Further Redirect Examination by Mr. Fleming .Pg. 68

17   Testimony of BOYD A. SULLIVAN:

18        Direct Examination by Mr. Fleming . . . . . .Pg. 69

19        Cross-examination by Mr. Mericli . . . . . . .Pg. 79

20        Redirect Examination by Mr. Fleming . . . . .Pg. 82

21        Recross-examination by Mr. Mericli . . . . . .Pg. 84

22   Testimony of DAVID J. EDDY:

23        Direct Examination by Mr. Fleming . . . . . .Pg. 85

24        Cross-examination by Mr. Mericli . . . . . . .Pg. 90

25

1    I N D E X

2    Testimony of JOSE MALDONADO:

3            Direct Examination by Mr. Fleming . . . . . . .Pg.  91

4            Cross-examination by Mr. Mericli . . . . . . . Pg.  96

5            Redirect Examination by Mr. Fleming . . . . .Pg.  98

6    Testimony of THEODORE ROBINSON, III:

7            Direct Examination by Mr. Fleming . . . . . . .Pg.  100

8    Testimony of DONALD KLOS:

9            Direct Examination by Mr. Fleming . . . . . . .Pg.  106

10           Cross-examination by Mr. Mericli . . . . . . . Pg.  118

11           Redirect Examination by Mr. Fleming . . . . .Pg.  122

12   Testimony of DANIEL TELEGA:

13           Direct Examination by Mr. Fleming . . . . . . .Pg.  124

14           Cross-examination by Mr. Mericli . . . . . . . Pg.  129

15           Redirect Examination by Mr. Fleming . . . . .Pg.  131

16   Testimony of ROBERT KREIDER:

17           Direct Examination by Mr. Fleming . . . . . . .Pg.  133

18           Cross-examination by Mr. Mericli . . . . . . . Pg.  143

19           Redirect Examination by Mr. Fleming . . . . .Pg.  150

20   Testimony of PAUL ALLEN:

21           Direct Examination by Mr. Fleming . . . . . . .Pg.  153

22           Cross-examination by Mr. Mericli . . . . . . . Pg.  158

23           Redirect Examination by Mr. Fleming . . . . .Pg.  159

24

25

1    I N D E X

2    Testimony of JESSIE WITTEL:

3          Direct Examination by Mr. Fleming . . . . . . .Pg.  160

4          Cross-examination by Mr. Mericli . . . . . . . Pg.  167

5          Redirect Examination by Mr. Fleming . . . . . .Pg.  168

6          Recross-examination by Mr. Mericli . . . . . . Pg.  169

7          Further Redirect Examination by Mr. Fleming . .Pg.  171

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    P R O C E E D I N G S

2            JUDGE BAXTER:   Morning.

3            MR. MERICLI:   Good morning.

4            MR. FLEMING:   Morning.

5            JUDGE BAXTER:   Are we ready to begin?

6            MR. MERICLI:   Yes, your Honor.

7            MR. FLEMING:   Yes.

8            JUDGE BAXTER:   All right, the case is yours Mr.

9    Fleming, so I turn the stage to you.

10            MR. FLEMING:   All right.

11            JUDGE BAXTER:   You may begin.

12            MR. FLEMING:   I'm going to start with my story.

13    I'm going to get past an opening statement, your Honor.

14        JUDGE BAXTER:   All right, then you want to come onto

15    the witness stand?

16        MR. FLEMING:   Yeah, I just want to do that.

17        JUDGE BAXTER:   You have to get on the witness stand to

18    testify on your own behalf.   All right, we'll swear you in,

19    come on up here.   Do you want to bring your documents with

20    you, please?

21            MR. FLEMING:   Yeah.

22            JUDGE BAXTER:   And the exhibits you'll be using.

23    You have a little bit of a place there to lay them.

24

25        R O N A L D   F L E M I N G,  first having been duly

1    sworn, testified as follows:

2

3        CLERK:  Sir, would you please, state your full

4    name and spell your last name for the record.

5        THE WITNESS:  Ronald E. Fleming, Jr.,

6    F-L-E-M-I-N-G.

7        JUDGE BAXTER:  Begin when you wish to, sir.

8

9    DIRECT EXAMINATION

10   BY MR. FLEMING:

11       A.  I'm going to start with on May 22nd, 2002 I

12   initiated a 1983 action in the U.S. District Court in the

13   Western District of Pennsylvania.  On May 20th, 2002 I

14   received a frivolous misconduct from defendant, Captain Weaver

15   for lying to an employee in retaliation for my exercising my

16   First Amendment Rights and the investigation of this

17   supplemental and original 1983 action, which I'll use as

18   Exhibit 1 (indicating).

19       JUDGE BAXTER:  Let the record reflect that the

20   exhibit, Exhibit 1, has already been entered into evidence.

21   Go ahead.

22       A.   Two grievance were filed on the defendants that

23   assaulted me and denied me medical treatment on May 15th,

24   2002.  Exhibit 2, I have the two grievances and medical sick

25   call slips attached with it.

1      JUDGE BAXTER:  Let the record reflect Exhibit 2,

2  Plaintiff's Exhibit 2 has already been entered into evidence.

3      A.    On August 2nd, 2002 I received a frivolous

4  misconduct from defendant, Officer Davison and Officer

5  Maldonado for destroying, altering, tampering with or damaging

6  property by accusing of breaking a cuff key in retaliation for

7  exercising my First Amendment Right and initiating the

8  original 1983 action.  I was found guilty of this misconduct

9  and sanctioned 30 days disciplinary custody.  And Exhibit 3,

10  the event was videotaped.

11      JUDGE BAXTER:  Let the record reflect Exhibit 3,

12  the individual videotape has already been entered into

13  evidence.

14      A.    On August 23rd, 2002 I received a frivolous

15  misconduct from defendant, Officer Davison and Maldonado for

16  assault and refusing to obey an order after an incident that

17  occurred while being escorted outside the morning yard.  And

18  in turn being assaulted by Officer Davison by yanking on the

19  yard gate causing it to hit me in the right elbow very hard

20  before it being secured into the yard.  In retaliation and

21  placed on cell restriction for eight days before going to a

22  disciplinary hearing, then found guilty.  Sanctioned 135 days

23  disciplinary custody.  Exhibit 4, videotape.            JUDGE

24  BAXTER:  Let the record reflect that Exhibit 4, Plaintiff

25  Exhibit 4 has already been placed into evidence.

A.   On August 31st, 2002 I received a frivolous misconduct from defendant, Captain Robinson for lying to an employee in retaliation based on my abuse allegations against Officer Davison for exercising my First Amendment Rights, which Captain Robinson investigated and found no evidence to support my claims.  Exhibit 5, again videotape.          JUDGE BAXTER:   Exhibit 5 which is the documents and not the videotape has already been entered into evidence.

A.   New defendants, Camp Hill.  On August 11th, 2003 I received a frivolous misconduct from defendant, Officer Wittel, W-I-T-T-E-L.

JUDGE BAXTER:  Wittel.

A.   For refusing to obey an order and using abusive, obscene or inappropriate language to an employee in retaliation for the filing of a sworn affidavit for my fellow inmate.  Defendants Officer Allen and Sergeant Kreider are also named on the misconduct as witnesses in retaliation as well.  I was sanctioned 60 days disciplinary custody for this misconduct.  Exhibit 7 --

JUDGE BAXTER:  Six?

MR. FLEMING:  Yeah, Exhibit 6.  I have seven.

JUDGE BAXTER:  Six and seven.  Six is your affidavit I have here (indicating).

MR. FLEMING:  My affidavit is six, yeah.

JUDGE BAXTER:  All right.

1          MR. FLEMING:  Okay.

2          JUDGE BAXTER:  You're also talking about the

3    misconduct on --

4          MR. FLEMING:  Yeah, that's the misconduct on

5    August 11th.

6          JUDGE BAXTER:  That's also part of Exhibit 7 I

7    have here (indicating).

8          MR. FLEMING:  Yeah, I'm going to go back to six

9    because I missed six, if that's okay.

10         JUDGE BAXTER:  That's all right.

11         MR. FLEMING:  All right, I'll go to six then and

12    move that into evidence.

13         A.    All right, six.  On August the 2nd, 2003 I

14    witnessed defendants, Officer Allen, Wittel, Sergeant Kreider

15    assault another inmate, Tyrone Colbert, during a cell search

16    which I filed a sworn affidavit for this fellow inmate,

17    Exhibit 6.

18         JUDGE BAXTER:  Let the record reflect that Exhibit

19    6 has been placed into evidence.

20         MR. FLEMING:  Seven, please.

21         JUDGE BAXTER:  You have already described it, so

22    why don't you give it to me?

23         MR. FLEMING:  That's right, Plaintiff Exhibit

24    Number 7 has already been placed into evidence.

25         JUDGE BAXTER:  Thank you.

1    A.    On August 12th, 2003 I attended my 30 day PRC

2    review and handed staff a request slip clearly indicating that

3    I witnessed these officers assault another inmate during a

4    cell search, and that the August 11th misconduct is in

5    retaliation for me filing the August the 12th.  So three

6    affidavit, Exhibit 8.

7    JUDGE BAXTER:  Let the record reflect that Exhibit

8    8 has already been placed into evidence.

9    A.    On September 15th, 2003 I supplemented the civil

10    action adding a new defendant for violation of my First and

11    Eighth Amendment Rights of the Constitution, and that is not

12    an exhibit, this is something that I --

13    JUDGE BAXTER:  That's all right.

14    A.    I have the DC-ADM-001 policy as Exhibit 9.  That's

15    the policy and --

16    JUDGE BAXTER:  What's the point of this?  Tell me.

17    MR. FLEMING:  To -- Because -- To show that they

18    had to follow procedure whenever you make a claim of anything

19    happening to you, they have to sign certain documents and

20    stuff like that.

21    JUDGE BAXTER:  This is a -- This is Exhibit 9, the

22    policy statement, the Inmate Abuse Allegation Monitoring

23    Policy, and it has already been placed into evidence.

24    MR. FLEMING:  Excuse me, I have two tapes, law

25    library tape, the incident on my way to do some legal research

1    at Albion with segment one with the medical exams, and segment

2    two, that's Exhibit 10.  And the morning yard tape is Exhibit

3    11.

4                JUDGE BAXTER:  Do you want us to play those now?

5                MR. FLEMING:  No, not yet.

6                JUDGE BAXTER:  All right, the Exhibits 10 and 11

7    are videotapes.  One is a videotape dated 5-14-02.  One is a

8    videotape dated 8-23-02.  They have already been placed into

9    evidence and the plaintiff does not wish to show those to the

10   Court at this time.  All right, continue.

11               MR. FLEMING:  Basically, I just wanted to present

12   my story so I can lay a foundation to establish my

13   constitutional violations and that's all I have right now.

14               JUDGE BAXTER:  What about your claim for injury?

15               MR. FLEMING:  Oh, the violations.              JUDGE

16   BAXTER:  Your claim of injury, do you want to tell the Court,

17   put into evidence your story of the claim of injury?

18               MR. FLEMING:  Yeah.

19               JUDGE BAXTER:  You told me about the gate with the

20   elbow, you told me about the broken cuff key.  I'm not sure I

21   heard about everything you have in your pretrial statement.

22               MR. FLEMING:  That's --

23               JUDGE BAXTER:  Have you listed everything?

24               MR. FLEMING:  Yeah.

25               JUDGE BAXTER:  Are you prepared to go into

1    cross-examination?

2            MR. FLEMING:  Right, during my cross and my direct

3    I can establish more, get into more detail.          JUDGE

4    BAXTER:  Well, this is your direct.

5            MR. FLEMING:  Okay.

6            JUDGE BAXTER:  Okay.  So if there's anything else

7    you want to say before being placed under cross-examination,

8    this is your time.

9            MR. FLEMING:  I'm ready for the cross.

10   JUDGE BAXTER:  All right, Mr. Mericli, cross-examination.

11           MR. MERICLI:  May it please the Court, does your

12   Honor mind if from time to time I may be seated during the

13   cross-examination?

14           JUDGE BAXTER:  That's quite all right, anything

15   that's comfortable for counsel.

16           MR. MERICLI:  Thank you.

17

18    CROSS-EXAMINATION

19   BY MR. MERICLI:

20

21       Q.   You had your back turned to him when you say Mr.

22   Tiller tried to trip you, right?

23       A.   Yes.

24       Q.   You weren't looking directly at him when he, as

25   you say, tried to trip you?

1    A.    Afterwards I did, but I wasn't expecting it to

2    happen that way, so I just kept following procedure.

3    Q.    But you knew it was Tiller right away?

4    A.    I knew for a fact it was him.

5    Q.    But you didn't see him do it?

6    A.    I didn't see him but he was the officer that

7    escorted me with the tether.

8    Q.    You say the video depicts him, shows him actually

9    either attempting to trip you or kicking you?

10    A.    The video shows him striking me in my -- in my

11    right ankle.  And it felt more like a kick.  I don't -- I

12    can't really say if it was intended to kick me or trip me but

13    it was a kick.

14    Q.    But, Mr. Fleming, you are saying today under oath

15    in this court that if one looks carefully at that video, even

16    if one looks at it in stop motion or if one rewinds it slowly

17    through the incident, you will actually see Mr. Tiller's foot

18    come in contact with your ankle?

19    A.    The tape will clearly show -- Not only will it

20    show but it will establish that I was injured in the second

21    segment due to the immediate --

22    Q.    Well, thank you.  Thank you.  I understand that

23    you have some other points to make, but my point here -- And

24    let's leave on that point that you say the tape will clearly

25    show, am I correct, Mr. Tiller's foot coming in contact in the

1  nature of a kick with your ankle?

2      A.    Yes, it will.

3      Q.    Very good.  That leads to the next point actually,

4  Mr. Fleming.  You've seen the tape of Mr. Klos, the nurse, I

5  believe -- Is he here?  Yes, there he is.  Good morning, sir.

6      You've alluded to that already, that Mr. Klos examined

7  you in the aftermath of whatever incident occurred with Mr.

8  Tiller, right?  You saw that tape?

9          MR. FLEMING:  Objection, that's -- Objection,

10  that's irrelevant.

11          JUDGE BAXTER:  You're objecting to the question as

12  irrelevant.  Mr. Mericli?

13          MR. MERICLI:  The question is directly related to

14  testimony that he gave on the stand and the issues before the

15  Court.  I'm simply asking him if he recalls having seen what

16  he's testified to earlier, which is the videotaped medical

17  examination by Mr. Klos that took place in the aftermath of

18  the incident with Mr. Tiller.

19          JUDGE BAXTER:  I see.  Objection overruled, he can

20  ask you that.

21  BY MR. MERICLI:

22      Q.    You mentioned that as segment two.  So let's just

23  clear away the smoke there and -- which may have been of my

24  making and get to the point.  You remember seeing the video of

25  Mr. Klos examining you?

1     A.     Yes, I do, it will be showed through that.

2     Q.     You say he did not examine your ankle?

3     A.     No, he did not.

4     Q.     You say he did not examine your wrist?

5     A.     I had handcuffs on the whole time.

6     Q.     Am I right you say your wrist was cut and

7 bleeding?

8     A.     It was hurting bad.

9     Q.     But it wasn't cut?

10     A.     It was -- It was -- It was cut.

11     Q.     And blood -- You were bleeding?

12     A.     It wasn't -- It wasn't bleeding where it was bad

13 but it was, yes, it was.   My skin was -- My skin was damaged,

14 yes, it was.

15     Q.     So your skin was broken?

16     A.     Yes, it was.

17     Q.     Okay.   You say you never had x-rays taken of your

18 ankle and your wrist in some of those materials that you've

19 introduced today?

20     A.     Repeat that again.

21     Q.     Did you have any x-rays taken?

22     A.     I believe I did have a x-ray for my -- my elbow.

23          JUDGE BAXTER:   Mr. Mericli, is this on this

24 incident or for --

25          MR. MERICLI:   No, just on this incident.   I don't

1  believe we have any medical records or testimony with regard

2  to the elbow incident.

3           JUDGE BAXTER:  This question is, did you have --

4  On this incident did you have any x-rays taken?

5           THE WITNESS:  No, I did not.

6  BY MR. MERICLI:

7      Q.   During the videotape exam by Mr. Klos you could be

8  heard admitting that you were spitting in the direction of

9  corrections officers, right?

10     A.   No, I did not admit that.

11     Q.   So you're testifying here today that if the Court

12 listens to the videotape it will not hear you admit to

13 spitting?

14     A.   It will, yes, it will.

15     Q.   It will hear you admit to spitting?

16     A.   Yes, it will.

17     Q.   Well, then I don't understand.  Maybe you can it

18 explain to me.  I just asked you if you in fact admitted to

19 spitting during the videotaped exam with Mr. Klos and you

20 said, no.  And then subsequently you said, yes.  Could you

21 clear up my confusion?

22     A.   Yes, I can.

23     Q.   Please do.

24     A.   I admitted to spitting but not in the direction of

25 any officer after the fact.

1    Q.    What did you spit on and why?

2    A.    The reason why I did it, because of the assault

3    that I suffered and I had no other way to release my anger and

4    that's what I did.

5    Q.    Where did you spit?

6    A.    Inside the law library.

7    Q.    What did you spit on?

8    A.    I can't recall what it was on or where it was at,

9    but I do admit that I did do it.

10    Q.    Okay.  Do you remember when Mr. Telega, the

11    physician's assistant, who is in the courtroom today examined

12    you after the incident with Tiller?

13    A.    Yes, I do.

14    Q.    Okay.  Did he look at your ankle?

15    A.    Yeah, he looked at it.  Yeah.  Yes, he did, he

16    looked at it.

17    Q.    And he looked at your wrist?

18    A.    He looked at both, yes, he did.

19    Q.    Now, I'd like to you take a look at Exhibit 6 that

20    you have there.  I think I can put it here.            JUDGE

21    BAXTER:  I'll give it to him.

22    Q.    Do you remember this (indicating)?  We looked at

23    it yesterday?

24          JUDGE BAXTER:  It's also on your screen, Mr.

25    Fleming.

1    A.    Oh, this is --

2          JUDGE BAXTER:  We're high tech here.

3    A.    No, six on yours -- Okay, yeah.  This ain't --

4    This is the request that --

5    Q.    We marked this yesterday as Plaintiff Exhibit 6?

6    A.    Mine must be seven.

7          CLERK:  Six is the sworn affidavit.

8          MR. MERICLI:  That was suppose to be eight.  I

9    believe we got it confused.  What number is this --

10         JUDGE BAXTER:  Let me find it for you.

11         MR. FLEMING:  I don't know where yours is.

12   JUDGE BAXTER:  It's number eight.

13         MR. MERICLI:  Thank you.

14   Q.    I'm sorry, it's Exhibit Number 8.  Can you tell me

15   what the date on that is?

16   A.    August 12th, 2003.

17   Q.    What date did corrections Officer Wittel give you

18   the misconduct?

19   A.    August -- Can I see that exhibit?  I believe --

20   Yeah, okay.

21         THE WITNESS:  Your Honor, may I please see --

22   JUDGE BAXTER:  Which one?

23         THE WITNESS:  The misconduct I got from Officer

24   Wittel.

25         JUDGE BAXTER:  It's Exhibit 7.  Here you go

1    (indicating).

2    BY MR. MERICLI:

3        Q.    What about if I suggest to you it was August 11th,

4    the day before?

5        A.    I can tell you now.  August 11th, yes, it was.

6        Q.    Okay, very good.  Now, let's take a look at

7    Exhibit 6.  Do you recognize that?

8        A.    Yes, I do, that's -- Yes, I do.

9        Q.    On the second page could you tell us what the date

10    of that is?

11        A.    August 2nd.

12        Q.    Okay.  So that's how many days before the

13    misconduct?

14        A.    Exactly nine days.

15        Q.    Okay.  I'd like you to take a look at something

16    that's in my Exhibit "C".  Do you have a copy of that up there

17    or do you want to wait until I put it on the screen?

18        A.    Yeah, you can put it on the screen.

19        Q.    I'm sorry, it's Exhibit "E".  Captain Weaver's

20    report, and one of the attachments on that that we looked at

21    yesterday is your grievance that you wrote about the incident

22    with Mr. Tiller.  Do you remember that?

23        A.    Yes, I do.

24        Q.    And here it is (indicating).  Do you recognize

25    this as the grievance that I just referred to?

1    A.    Yes, I do.

2    Q.    Can you tell us the date on it?

3    A.    May 15th, 2002.

4    Q.    Okay, could you read beginning here (indicating)?

5    Could you read this part that required you to provide a brief,

6    clear statement of your grievance, please?

7    A.    Yes, I can.

8    Q.    Please do.

9    A.    "This grievance is not retaliation, but to let you

10    know that, first of all, whenever I exit my cell I'm placed on

11    camera.  After reviewing the camera that's been placed on me

12    since April 21st, 2002 it will clearly establish that I was

13    assaulted by CO Tiller and CO Sullivan on my way to the law

14    library.  All of this --"  "-- All of this while in the

15    presence of Sergeant Eddy.  Also I spoke to RHU Lieutenant

16    Morrow and Lieutenant Jones, they never checked into.  Also

17    I've been trying to get my --" " -- I've been trying to get my

18    injuries checked into.  CO Tiller kicked me in my right ankle

19    while exiting my cell.  Then once I got into the law library,

20    after the cuffs were removed CO Sullivan slammed my right

21    wrist through the wicker and held it trapped there for about

22    10 seconds.  I am --"  I can't see because you keep --

23        CLERK:  Nobody is touching it.  I don't know why

24    it's doing that.

25        THE WITNESS:  I'm touching it up here.

1              CLERK:  That's why.  If you touch it it puts an

2      arrow on it.

3              A.    That's -- I'm sorry.  "I am assuming that the

4      video camera will not be checked into for their illegal

5      actions.  But if so, you will see the truth."

6              Q.    Thanks.  Where does it say there that Sullivan

7      used his foot?

8              A.    It doesn't say.

9              MR. MERICLI:  Okay.  I have no further questions

10     at this time.

11             JUDGE BAXTER:  Thank you.  All right, you have --

12     You're on redirect now, which means if there's anything that

13     he asked you that you want to clear up, anything else you want

14     to say, this is your chance to say it.

15             MR. FLEMING:  These are non-leading, right?

16     Redirect is non-leading?

17             JUDGE BAXTER:  Well, you're not asking questions

18     of yourself, you're not asking questions of him either.  This

19     is your opportunity to give any more testimony.

20             MR. FLEMING:  For me?

21             JUDGE BAXTER:  That's right and if you have no

22     more testimony you will step down and call your next witness.

23             MR. FLEMING:  No further questions.          JUDGE

24     BAXTER:  All right, you may step down, Mr. Fleming, and call

25     your next witness.

1          MR. FLEMING:  All right

2          JUDGE BAXTER:  I'll give you a few minutes to

3   collect your things there.

4          MR. FLEMING:  All right, thank you.  I'd like to

5   call -- Can I stand up?

6          JUDGE BAXTER:  You sure may.  You may do whatever

7   is more comfortable for you.

8          MR. FLEMING:  I'd like to call my first witness,

9   Which is -- He's not here.  May I ask --

10          MR. MERICLI:  Who would you like to call?

11   MR. FLEMING:  It's been awhile.  Some of these faces, I ain't

12   familiar with.

13          JUDGE BAXTER:  That's okay.  Call the name and

14   you'll see who is attached to the face.

15          MR. FLEMING:  Captain Weaver.

16          MR. MERICLI:  Captain Weaver is here.          JUDGE

17   BAXTER:  Captain Weaver, would you please come up here?  Keep

18   your voice, Mr. Fleming, toward the microphone because it's

19   hard for the Court Reporter to hear you.  You're mumbling

20   sometimes, okay.

21          MR. FLEMING:  Okay.

22          JUDGE BAXTER:  I get to see some of these names

23   with the faces today, too.

24

25          T H O M A S   W E A V E R, first having been duly  sworn,

1    testified as follows:

2

3             CLERK:   Sir, would you please state your full name

4    and spell your last name for the record.

5             THE WITNESS:   Thomas R. Weaver, W-E-A-V-E-R.

6

7    DIRECT EXAMINATION

8    BY MR. FLEMING:

9

10        Q.    Good afternoon.   Please, state your name again.

11        A.    Thomas R. Weaver.

12        Q.    Thank you.   How are you employed?

13        A.    I'm a Captain with the Department of Corrections

14    at SCI Albion.

15        Q.    How long have you been a captain there?

16        A.    Since 2000.   It will be five and a half years.

17    March of 2000.

18        Q.    How long have you been involved in the department

19    of corrections work?

20        A.    It will be 22 years in January.

21        Q.    I want to direct your attention to the incident of

22    May 14th, 2002.   What were your duties that day?

23        A.    I was assigned as the intelligence captain.

24        Q.    Can you describe the operation?

25        A.    Of the intelligence captain?   Or this specific

1    investigation?

2        Q.    I would like to direct your attention to May 14th

3    of 2002, what were you duties that day?

4        A.    This particular day I conducted the investigation

5    into your abuse allegations.

6        Q.    Can you describe the operation?

7        A.    The investigation took place, I reviewed the

8    documents that you had submitted, reviewed the videotapes and

9    conducted interviews.

10        MR. MERICLI:    Your Honor, if I may interject, I

11    believe he asked him about May 14th, 2002.  I think there

12    might be some confusion at this point about whether or not

13    he's asking him about an investigation conducted of events on

14    May 14th, 2002 or what in fact he did on May 14th, 2002.

15    There's nothing relevant --

16        JUDGE BAXTER:    It may be, but he's the witness,

17    he's the one testifying.    So?

18        A.    I'm not sure.    Could you be a little more specific

19    as to what you're after?

20        MR. FLEMING:    Your Honor, may I just lead him to

21    where he needs to be at?  Like --

22        JUDGE BAXTER:    Can you lead the witness?

23    MR. FLEMING:    Just to get him --

24        JUDGE BAXTER:    Permission granted, yes, he's a

25    defendant, he's definitely a hostile witness.

1    BY MR. FLEMING:

2        Q.    I'm speaking in terms of the incident with the --

3    going to the law library, the investigation you did with me,

4    going there and coming back.

5        A.    Okay, you're speaking of my investigation?

6        Q.    Right.

7        A.    Okay.

8        Q.    Can you describe the operation?

9        A.    Of my investigation?

10       Q.    Yes.

11       A.    I would have reviewed all the documents included,

12   and done my interviews, including you and the staff members

13   involved.

14       Q.    Thank you.  During the course of your duties that

15   day, did you come in contact with the plaintiff in the

16   courtroom today --

17       A.    I'm not sure if the 14th is the exact day of the

18   investigation.  I don't have the report in front of me and I

19   don't remember which day I interviewed you, but I did

20   interview you as part of the investigation.

21       Q.    What was the date?  But you do remember?

22       A.    I do not remember.  I do not have a copy of the

23   investigation with me.

24       Q.    You do remember coming in contact with me?

25       A.    I interviewed you a few days after the alleged

1    incident.

2         MR. FLEMING:  Your Honor, can I give him --

3    JUDGE BAXTER:  You can refresh his recollection with a

4    document if you'd like.

5    BY MR. FLEMING:

6         Q.    It was May 20th; do you remember that?

7         A.    I won't argue that that's not the date.  As I

8    said, I don't have the investigation in front of me.

9         Q.    That's good enough.  But you do remember coming in

10   contact with me?

11        A.    As I said, yes, I did interview you.

12        Q.    Are you positive it was me, the plaintiff?

13        A.    Yes, I'm positive it was you.

14        Q.    I just want to back up.

15             JUDGE BAXTER:  Mr. Fleming, you look uncomfortable

16   standing.  You can sit down if you'd like.          MR.

17   FLEMING:  No, I'm okay.

18             JUDGE BAXTER:  Sorry, never mind.

19             MR. FLEMING:  I'm into it now.

20   BY MR. FLEMING:

21        Q.    I just want to back up.  What did you -- What was

22   your results of that coming in contact with me, and what did

23   it -- what did it entail?

24        A.    The results of my interview with you?

25        Q.    Right.

1    A.    I found that the allegations you had made were not

2    substantiated by anything you told me and by the review of the

3    videotape.

4    Q.    Was it the videotape that you reviewed?

5    A.    I did review the videotape before I interviewed

6    you.

7    Q.    And this videotape showed the whole incident?

8    A.    It shows where you allege that you were kicked.

9    It does not show the incident where you alleged the wicker was

10   closed on your hand.

11   Q.    Do you remember giving a sworn affidavit on

12   November 19th, 2004?

13   A.    I did an affidavit.  I don't remember the exact

14   date.

15   MR. FLEMING:  Can I present this to him, your

16   Honor?

17   JUDGE BAXTER:  You may approach the witness to

18   hand him a document, yes.  Do I have that as an exhibit?

19   MR. MERICLI:  Your Honor, I believe it's marked as

20   Exhibit "E".  This is a copy of it here (indicating), if you

21   would prefer him to use that.

22   MR. FLEMING:  I'd like the record to reflect that

23   --

24   JUDGE BAXTER:  Exhibit "E" is also -- Would you

25   mind placing that under the document viewer for me?

1    MR. MERICLI:  Not at all.

2              JUDGE BAXTER:  Let the record reflect that the

3    plaintiff is showing the witness the last page I believe.

4         A.    You're showing me the date, is that what you're

5    showing me?

6         Q.    Yeah.

7         A.    November 9th?

8              JUDGE BAXTER:  It reflects the 9th.

9         Q.    Do you remember giving a sworn --

10        A.    Yes.

11        Q.    Okay, thank you.  I have something else.  I would

12   like to keep this here for a minute.

13             JUDGE BAXTER:  Can you flip that one back?

14             CLERK:  Yes.

15             JUDGE BAXTER:  It's suppose to be November 19th.

16   Do you have a date there?

17             MR. MERICLI:  I can find that.

18             JUDGE BAXTER:  Can you do that for me, because the

19   one I have is October 22nd, so I must have had the wrong one.

20             MR. MERICLI:  The November 19th is the date that I

21   mailed them and that's my signature date on the back.

22   JUDGE BAXTER:  Did the witness see the date November 19th on

23   the document he looked at?

24             THE WITNESS:  It's on the very last page, that's

25   the date that the attorney --

1        JUDGE BAXTER:  Certificate of service.

2        CLERK:  Yes, it's the certificate of service.

3    JUDGE BAXTER:  All right.

4        THE WITNESS:  It wasn't the date of the actual --

5        JUDGE BAXTER:  It wasn't the date of the

6    affidavit, okay.

7        MR. FLEMING:  Can you put that on page -- on this

8    page right here (indicating), question number 16?

9        CLERK:  Yes.  Do you want the typed answer?

10    MR. FLEMING:  Right here (indicating).        JUDGE

11    BAXTER:  Next is the answers.

12        MR. FLEMING:  Yes.

13        JUDGE BAXTER:  It should have the question as

14    well.  Number 16 here is "If the answer to question", that

15    one?

16        MR. FLEMING:  Yes.

17    BY MR. FLEMING:

18    Q.    You were asked, "If the answer to question 14 is

19    yes, do you have any knowledge of any item mentioned there

20    being altered in any manner, lost or destroyed?  And you

21    stated, no, under oath?

22    A.    That's what I stated.

23    Q.    All right.  And I'd like to go to your

24    investigation that you conducted.

25        JUDGE BAXTER:  Is his report part of this exhibit,

1    Mr. Mericli?

2              MR. MERICLI:  Yes, it is.

3              JUDGE BAXTER:  All right.

4         Q.    I'd like to read this for you, if it's all right.

5              JUDGE BAXTER:  We can also have it on the screen,

6    so hold on one second.

7         Q.    Page six, right here (indicating).  Sorry, go to

8    page eight, the summary.  And I'm just going to read to a

9    certain point.  I'm not going to read the whole thing of what

10   you stated in the investigation.

11        "On 5-14-02 Inmate Fleming, EM-7566 was being escorted

12   from his cell (H/B 8) to the law library by CO1 Tiller and CO1

13   Massey.  The escort was being videotaped by CO1  Sullivan.

14   Inmate Fleming has alleged that, during that escort Officer

15   Tiller kicked/tripped him causing injury to his right ankle

16   and that when placed in the law library Officer Sullivan

17   slammed his arm with the wicker door and that Sergeant Eddy

18   witnessed all of this.  All staff involved deny that Fleming

19   was kicked or tripped by Officer

20   Tiller.  Additionally, all staff deny that Officer Sullivan

21   slammed the wicker door on inmate Fleming's arm.  The video of

22   the escort shows inmate Fleming stumble.  Officer Tiller is

23   following him holding on to the tether.  There is

24   approximately 12 to 18 inches of the tether stretched out and

25   Officer Tiller's arm appears to be almost completely extended,

1  putting him several feet behind Fleming.  It would have been

2  extremely difficult if not impossible for him to have

3  kicked/tripped Fleming without it being very obvious on the

4  video.  The video stops just prior to the cuffs being removed

5  and in the law library."

6          MR. FLEMING:  I would like to have that moved into

7  evidence.

8          JUDGE BAXTER:  It already is part of the evidence.

9          MR. FLEMING:  Okay.

10         JUDGE BAXTER:  But it is noted in the record.

11     MR. FLEMING:  All right, thank you.  No further

12  questions for him, your Honor.

13         JUDGE BAXTER:  All right, Mr. Mericli.

14

15   CROSS-EXAMINATION

16  BY MR. MERICLI:

17

18     Q.   Have you had an opportunity to review the report

19  of your investigation into the incident in which Mr. Tiller is

20  accused of having kicked Mr. Fleming?

21     A.   Yes, sir.

22     Q.   Did you review it in preparation for your

23  testimony here today?

24     A.   Briefly, yes, sir.

25         JUDGE BAXTER:  Mr. Fleming, I'd like to you sit

1    during his examination if that's all right.

2                    MR. FLEMING:   All right.

3                    JUDGE BAXTER:   Thank you.

4    BY MR. MERICLI:

5        Q.    You mention in your direct examination that you

6    have reached some conclusions regarding the truth of his

7    accusations in the course of your investigation; did you not?

8        A.    Yes, I did.

9        Q.    What specifically?  Could you reiterate were those

10   conclusions?

11       A.    There were a number of allegations made that

12   Officer Tiller kicked inmate Fleming at the time, and

13   intentionally that his hand was slammed in the wicker, that he

14   had -- He also alleged in his grievance --

15       Q.    By whom that his hand was slammed in the wicker?

16       A.    By Officer Sullivan.

17       Q.    So there was an allegation with regard to Tiller

18   kicking him and an allegation with regard to Sullivan slamming

19   his hand in the wicker?

20       A.    Correct.

21       Q.    What is a wicker?

22       A.    It's a door that is approximately 18 inches by 12

23   inches that's located at a height to facilitate cuffing and

24   uncuffing.  So --

25       Q.    It's a slot?

1    A.    So the door would have been opened, he would have

2    stepped back to the door, he would have been unhandcuffed

3    through that door.

4    Q.    It's a slot in a door?

5    A.    Correct, with a metal door -- a smaller metal door

6    that covers that.

7    Q.    So it's something like a mail slot that we might

8    have in our homes or something like that?

9    A.    In a manner of speaking.

10    Q.    It's used for what purposes?

11    A.    On the -- On this particular door, which was the

12    law library, it would have been used to apply and remove

13    handcuffs or also pass legal material through the door, any

14    material that might be passed to the inmate.

15    Q.    So when an inmates hands are -- handcuffs are

16    removed, he backs up to the door?

17    A.    He backs up to the door.

18    Q.    And that's how he is cuffed, he puts his hands,

19    back in the wicker, through the door?

20    A.    That's correct.

21    Q.    And the assisting staff opened this slot and his

22    hands come out or his hands go in, right?

23    A.    Correct.

24    Q.    Okay.  That's what we're talking about when we're

25    talking about a wicker?

1        A.    That's the wicker door, yes, sir.

2        Q.    Do you know why it's called a wicker?

3        A.    I have no idea.

4        Q.    Thank you.

5              JUDGE BAXTER:   The door slides side to side or up

6    and down?

7              THE WITNESS:   These doors actually hinge and open

8    outward.

9              JUDGE BAXTER:   Okay, thank you.   Excuse me, Mr.

10   Mericli.

11             MR. MERICLI:   Not at all, your Honor

12   BY MR. MERICLI:

13        Q.    Does it drop then to kind of like a -- provide

14   like a drop leaf?

15        A.    They normally drop down and form like a shelf.

16        Q.    Okay, thank you.   Going back to these two

17   incidents, one involving Tiller and one involving Sullivan,

18   what had Mr. Fleming alleged happened to him?

19        A.    He alleged that Officer Tiller kicked him and he

20   alleged that the Officer Sullivan slammed the wicker door

21   closed on his hand.

22        Q.    Did he say how Sullivan did that?

23        A.    No, he did not.

24        Q.    Did you ever hear him say that Sullivan used his

25   foot to do that?

1    A.    No, I did not, I was never told that.

2    Q.    In the course of your investigation, you

3  interviewed him?

4    A.    Yes, I did.

5    Q.    And you discussed his allegations?

6    A.    Yes, I did.

7    Q.    How did he convey to you Sullivan did whatever he

8  alleged Sullivan had done to him?

9    A.    He indicated that he slammed the door.  Although

10  Officer Sullivan was the camera operator, not the officer

11  taking the handcuffs off.

12    Q.    Now, I would note for the record when you said he

13  slammed the door, you raised your hands upwards?

14    A.    That was my understanding.

15    Q.    You raised your hands upward as if you were

16  lifting something --

17    A.    Yes.

18    Q.    -- Imaginary?

19    A.    Yes.

20    Q.    That's what he showed you?

21    A.    That was my understanding, yes.

22    Q.    Okay.  Was that an assumption or was that the way

23  he conveyed it to you?

24    A.    At this point I would have to say, I may have been

25  making an assumption.

1    Q.    But as if it were an assumption, am I correct that

2    it was a working assumption, so that while were you exchanging

3    information, yourself with Mr. Fleming, it was at all times

4    clear that that's what you were talking about, that the hands

5    were lifted and raised up?

6    A.    Yes.

7    Q.    Thank you.  You reached some conclusions about his

8    grievance?

9    A.    Yes, he had also alleged the -- that he had -- he

10   alleged to me that he had not been seen by medical, that he

11   had not been treated by medical.  I questioned -- When I

12   questioned him I asked him, you're telling me were you not

13   seen by medical?  And this interview took place approximately

14   four, five days after the fact, after the incident and I had

15   already reviewed --

16   Q.    Let's take a look.  Can you tell from your report?

17   If I hand you a copy of your report, can you tell what date

18   the interview took place?

19   A.    Maybe.  Sometimes I mark it on there, but I don't

20   always do that.

21   Q.    How about this (indicating), does that help you?

22   A.    Yes, in this particular case did I mark it.  I

23   interviewed him on the 20th.

24   Q.    Okay.  What did he tell you about the medical

25   aftermath of these incidents?

1    A.    He told me he had not been treated, he had not be

2    seen.

3    Q.    What did you determine to be the truth or falsity

4    of that statement?

5    A.    Prior to this I had reviewed medical documentation

6    that he had been seen on several occasions, both by Nurse Klos

7    that very day that this took place, approximately an hour and

8    a half or so after the incident.    That examination was

9    videotaped.  I reviewed the videotape.  He told me he had not

10   touched his hand, he had not touched his -- looked at his

11   hands or foot.  It's clear in the videotape that the nurse did

12   manipulate the hands and the foot during his examination.

13   He had also been seen later by Mr. Telega.  Orders were

14   given for x-rays.  Whether or not they prescribed them or

15   anything, I don't know.  At this point I don't remember.

16   Q.    So what conclusion did you reach --

17   A.    My conclusion was that he had been seen by medical

18   and had been seen on a very timely basis.

19   Q.    What did that tell you about his statement to you

20   about --

21   A.    That they were patently false.

22   Q.    Thank you.  Have you had any reason to qualify,

23   retract or change any of the statements or any of the

24   conclusions that you reached in your report?

25   A.    No.

1      Q.   Do you recall an incident with Corrections Officer

2  Deforce that may have had some relationship to this event?

3          MR. FLEMING:  Objection.

4          JUDGE BAXTER:  What's your basis?  Why are you

5  objecting?

6          MR. FLEMING:  Relevance.

7          JUDGE BAXTER:  Well, it's hard to tell from the

8  question where you're going, Mr. Mericli

9          MR. FLEMING:  The --

10         JUDGE BAXTER:  Wait a minute.

11         MR. MERICLI:  The report --

12         JUDGE BAXTER:  Is there going to be testimony that

13  he did?

14         MR. MERICLI:  The report refers to the fact that

15  he looked into an event that preceded in time on the same

16  date.

17         JUDGE BAXTER:  So it's in this report?

18         MR. MERICLI:  It's in the report.         JUDGE

19  BAXTER:  That's part of the evidence, so it's relevant.

20  Objection overruled.

21  BY MR. MERICLI:

22      Q.   Do you recall looking into that?

23      A.   Yes, I do.  If I remember correctly, Officer

24  Deforce had written a misconduct earlier in the day for Mr.

25  Fleming.

1    Q.    How, if any way, did you see that relating to Mr.

2  Fleming's grievance?

3    A.    This action may have been retaliatory as a result

4  of that misconduct, the allegations that were made by Mr.

5  Fleming.

6    Q.    Retaliatory in what sense?

7    A.    Mr. Fleming was retaliating against staff for his

8  receiving a misconduct earlier in the day.

9    Q.    You're suggesting this was some sort of a --

10    A.    Suggesting it was some sort of a possibility.

11    Q.    You're suggesting it was a possibility this might

12  be a counterweight?

13    A.    Yes, sir.

14    Q.    But that's a speculation on your part?

15    A.    Speculation entirely.

16    Q.    That's an inference on your part?

17    A.    Yes.

18    Q.    As a result of the conclusions that you reached in

19  this investigation, what if anything did you do?

20    A.    As a result, the investigation would have been

21  submitted to my superiors and also sent forth to the Office of

22  Professional Responsibility in Harrisburg.

23    Q.    Did you take any further action --

24    A.    I wrote a misconduct on Mr. Fleming for --

25    Q.    What was --

1      A.     -- For lying to me.

2      Q.     Do you know what happened to that?

3      A.     I don't remember the results of the misconduct.

4      Q.     Do you have any reason to think that he was not

5  found guilty of it?

6      A.     No, I have no reason to believe that at all.

7      Q.     What if anything did your decision to file that

8  misconduct have to do with the fact that Mr. Fleming had been

9  working on a civil rights complaint against Superintendent

10  Wolfe, Deputy Kormanic, Deputy Marquardt or Mr. Boeh, Hearing

11  Examiner Barnett, Unit Manager Skendall, Mr. Barr the

12  Superintendent Assistant, and the Business Manager -- I'm not

13  sure what gender, McCarthy?

14      A.     Mr. McCarthy.

15      Q.     Mr. McCarthy?

16      A.     I had no knowledge of that suit.

17      Q.     Did you know he had been working on it?

18      A.     No.

19      Q.     Did you know whether or not it had been sent to

20  federal court?

21      A.     I did not know anything about it, no.

22      Q.     Did you hear him say the day it was filed on May

23  22nd of 2002, when he testified?

24      A.     No, I don't remember, I don't recall.

25      Q.     I see.  Were you able to determine if the complete

1    examination by Mr. Klos and Mr. Fleming appears on the

2    videotape?

3         A.    The examination by Mr. Klos is on the videotape.

4         Q.    Were you able -- Is there any apparent

5    interruption or any reason to believe it's not the complete

6    examination?

7         A.    No, it appeared to be the complete examination.

8         MR. MERICLI:    Thank you, sir, I have no further

9    questions.    Your witness, sir.

10

11    REDIRECT EXAMINATION

12    BY MR. FLEMING:

13

14         Q.    So you stated that you -- that you don't know if

15    it was -- my claim was being -- having my arm slammed in the

16    wicker was with a foot or not?

17         A.    You never mentioned it being done with a foot.

18         Q.    Was it in the video?

19         A.    No.    As I stated to you earlier, the video stopped

20    at the beginning of the unhandcuffing.

21         Q.    Let me redirect your attention back once more,

22    your investigation, in your interrogatories of production you

23    clearly state under oath that you do not have any knowledge of

24    this tape being lost, destroyed, altered or tampered; is that

25    correct?

1      A.    Correct.

2      Q.    And in your investigation report you clearly state

3   that the tape stops just before the handcuffs are removed out

4   of the wicker; is that correct?

5      A.    Correct.

6          MR. FLEMING:  No, further questions your Honor.

7          JUDGE BAXTER:  Thank you.  Anything else, Mr. Mericli?

8          MR. MERICLI:  Yes, your Honor.

9

10   RECROSS-EXAMINATION

11  BY MR. MERICLI:

12

13     Q.    In the course of preparing for this lawsuit, do

14  you recall being asked to locate any and all videotapes that

15  related to the allegations made in Mr. Fleming's complaints?

16     A.    Yes, sir.

17     Q.    Did you in fact execute an affidavit relatively

18  recently?  I'll show you a copy of it and hand it to you

19  (indicating), it's Exhibit "F".  I can show it to you here

20  (indicating), this is Exhibit "F".

21          Let me briefly page through it, so you can reacquaint

22  yourself with it.  Would you note the date for us there?

23     A.    The date is September 28th, 2005.

24     Q.    You recall this affidavit now that I've refreshed

25  you?

1          A.    Yes.

2          Q.    In the course of this affidavit, am I correct that

3    you swear that you looked for all the tapes --

4          A.    Yes, I did.

5          Q.    -- That he makes reference to?

6          A.    Yes, sir, I did.

7          Q.    And the only tapes you were able to find were the

8    two that you provided to me?

9          A.    That's correct.

10         Q.    If I may, the Court has marked them as Exhibits

11   "A" and "B" for the defense, and 10 and 11 for the plaintiff.

12   And you were not able to locate any other tapes?

13         A.    No, I was not.

14         Q.    When you look at the tape of Mr. Fleming being

15   taken to the law library, we can agree that the taping ends

16   after he's placed inside the law library; can we not?

17         A.    True, yes, sir, we can.

18         Q.    Is that the customary point to end a videotape of

19   that movement, evolution?

20         A.    It varies on the camera operator, every operator

21   is different.

22         Q.    Thank you.  Is there anything particularly

23   unusual?  Have you seen that before --

24               MR. FLEMING:   Objection.

25               JUDGE BAXTER:   Basis?

1          MR. FLEMING:  Relevance.

2          JUDGE BAXTER:  Overruled.

3     BY MR. MERICLI:

4          Q.   Have you seen it before in other instances or is

5     it unique to this one case?

6          A.   I have seen it -- I have seen it before.

7          Q.   Now back to your affidavit, you say that you were

8     not aware of an incident in which two cameras were set up

9     inside the RHU law library, no such tapes were found.  Can you

10    explain that to us, to the Court, what were you attempting to

11    --

12         A.   I believe that was the -- You'd have to read the

13    question itself.

14         Q.   The question itself?

15         A.   For that particular --

16         Q.   I was attempting to avoid that because it's

17    difficult to read.

18         MR. FLEMING:  Number two.

19         Q.   "Is there also --"  Let's see, "Is there also a

20    overhead (H-block) (B-pod) (RHU) video camera, too, of the

21    alleged incident of May 14th, '02?"

22         A.   I think that particular question was a question

23    further down.  "Produce a copy of the video of the plaintiff

24    where two cameras were set up inside the mini library."

25         Q.   I see, yes, you're right.

1    A.    And to my knowledge there was never an incident

2    where two cameras or a camera was set up inside the law

3    library, that's what I was trying to establish by my answer.

4         MR. MERICLI:    Thank you.    My clumsy questioning

5    was an attempt to get you to focus on that piece of

6    information for the Court.    Thank you.    No further questions

7    of Captain Weaver.

8         JUDGE BAXTER:    Anything on what he just asked?

9    MR. FLEMING:    Yes.

10

11   FURTHER REDIRECT EXAMINATION

12   BY MR. FLEMING:

13

14   Q.    Do we have cameras set up inside the RHU mini law

15   library in Albion?

16   A.    Inside the law library?

17   Q.    Inside the mini law library, yes, of the RHU?

18   A.    I do not know.    I can't answer that question.

19   Q.    You were the investigating captain, right; is that

20   correct?

21   A.    Right.

22   Q.    So you should be aware of every video and every

23   document that you review for investigation; is that correct?

24   A.    We have almost two hundred cameras throughout the

25   facility --

1    Q.    Let me redirect you back to the RHU mini law

2  library.  So you are aware that there's cameras in there?  Are

3  you aware of that?

4    A.    Inside the library?

5    Q.    Yes.

6    A.    The way I read that question was that we set up --

7  I understood that question to say that we had set up cameras

8  inside the library, not --

9    Q.    So you're --

10   A.    -- Not fixed cameras.

11   Q.    Are you saying that -- Yes or no, is there cameras

12  inside?

13   A.    There are mounted cameras as part of the facility

14  security system.

15   Q.    I'm going to ask you again, are there cameras

16  inside the RHU mini law library?

17        MR. MERICLI:  Objection, asked and answered.

18        JUDGE BAXTER:  He just answered the question.

19  Sustained.

20        MR. FLEMING:  Your Honor, I'd like to have that

21  statement moved into evidence --

22        JUDGE BAXTER:  It is in evidence, it's testimony

23  in evidence, sir.

24        MR. FLEMING:  Okay.  I don't have no -- I don't

25  have no further questions, your Honor, for this man.

1    JUDGE BAXTER:  You may step down.  Thank you very much,

2    Captain Weaver.

3         Call your next witness, Mr. Fleming.

4              MR. FLEMING:  I'd like to have Officer Tiller,

5    Sergeant Tiller.

6

7         J O H N   T I L L E R, first having been duly sworn,

8    testified as follows:

9

10             CLERK:  Would you please state your full name and

11   spell your last name for the record?

12             THE WITNESS:  John Leonard Tiller, T-I-L-L-E-R.

13

14    DIRECT EXAMINATION

15   BY MR. FLEMING:

16

17        Q.    Good afternoon.  Please, state your name again.

18        A.    John Leonard Tiller.

19        Q.    Thank you.  How are you employed?

20        A.    I'm a corrections counselor at SCI Albion.

21        Q.    How long have you been employed there?

22        A.    Six years in December.

23        Q.    How long have you been involved in correction

24   counseling?

25        A.    Corrections counseling just over a year.

1      Q.    Overseeing prisoners?

2      A.    Six years.

3      Q.    Thank you.  I want to direct your attention back

4   to May 14th, 2002.  What were your duties that day with the

5   plaintiff?

6      A.    I was assigned as a corrections officer one in

7   RHU, restricted housing unit.

8      Q.    Can you describe -- What were your duties that

9   day, May the 14th, 2002 with the plaintiff, me, the plaintiff

10  in the courtroom?

11     A.    I was assigned to escort you from your cell to the

12  RHU law library.

13     Q.    Can you describe the operation?

14     A.    Sure.  I come to your cell, I open the wicker, I

15  handcuffed your hands.  The camera operator was running the

16  camera.  We opened the door.  I escort you from the RHU cell

17  through the "B" pod door and into the RHU law library where I

18  uncuffed you.

19     Q.    During the course of your duties that day, did you

20  come in contact with the plaintiff in the courtroom today?

21     A.    (No audible answer.)

22     Q.    Today?  Did you come in contact with the plaintiff

23  in the courtroom today?

24     A.    Yes.

25     Q.    Can you describe how?

1    A.    I just did.  I escorted you from the RHU cell to

2    the RHU law library.

3    Q.    Can you describe how you came into contact with

4    the plaintiff?

5    A.    I opened your wicker.  I handcuffed you.  The cell

6    door was open.  I escorted you from your RHU cell through the

7    "B" pod door into the RHU law library where I uncuffed you.

8    Q.    By yourself?

9    A.    With Officer Massey and Officer Sullivan running

10   the video camera.

11   Q.    With no handcuffs on me?

12   A.    I just said I handcuffed you.

13   Q.    That's all you had on me?  I was -- That's all,

14   you had handcuffs on me?

15   A.    At the time, yes.

16   Q.    Nothing else?

17   A.    That's correct

18   Q.    You don't remember having an object on you called

19   a tether?

20   A.    Yes -- You're correct, there was a tether.  That's

21   part of the RHU equipment.  They are connected.  So, yes,

22   there was a tether involved, you're correct.

23   Q.    Thank you.  Do you recall filling out a DC-121?

24   A.    Yes.

25   Q.    For what?

1       A.    An allegation of abuse.

2       Q.    You think you can explain that a little bit

3  better, please?

4       A.    You accused me of kicking you and abusing you

5  while taking you to the RHU law library, and I filled out a

6  incident report stating to the fact that you had accused me of

7  that, yes.

8       Q.    When did you -- Do you recall the date you filled

9  it out?

10       A.    No, sir, I don't.

11       Q.    When are these DC-121's suppose to be filled out

12  after a incident is reported?

13       A.    As soon as possible.

14       MR. FLEMING:  I'd like to move -- I'd like to

15  approach the witness, your Honor.

16       JUDGE BAXTER:  What are you going to do?

17  MR. FLEMING:  I have a DC-121 report to show this officer.

18       JUDGE BAXTER:  You may.

19       MR. FLEMING:  Thank you.

20  BY MR. FLEMING:

21       Q.    Is that you right there (indicating)?

22       A.    Yes, it is.

23       Q.    You see the date on there?

24       A.    Yes.

25       Q.    Can you tell the Court the date?

1      A.    May, 20th 2002.

2      Q.    Can you tell the Court the date of the incident?

3      A.    I believe that was May 14th.

4            MR. FLEMING:  No further questions.  I'd like to

5      have that moved into evidence.

6            JUDGE BAXTER:  What is that, sir?  Identify that

7      document.

8            MR. FLEMING:  It's in Captain Weaver's

9      interrogatories and production.

10           JUDGE BAXTER:  Captain Weaver's?

11           MR. FLEMING:  Yeah.  Can you hand that --

12     JUDGE BAXTER:  Thank you, very much.  So that is exhibit --

13           MR. MERICLI:  "E".

14           JUDGE BAXTER:  "E", thank you, Mr. Mericli.  Let

15     the record reflect it was a page in Exhibit "E".  All right.

16           MR. FLEMING:  Thank you.

17           JUDGE BAXTER:  Do you have any other questions?

18     MR. FLEMING:  No.

19           JUDGE BAXTER:  All right, Mr. Mericli?

20           MR. MERICLI:  Thank you, your Honor.

21

22     CROSS-EXAMINATION

23     BY MR. MERICLI:

24

25     Q.    Do you know why you didn't write this until six

1    days later?

2        A.    I believe I had asked that day whether or not I

3    needed to write a report, and I was told I was not because the

4    entire incident was on videotape.    And six days later when I

5    came back to work -- I was off in the meantime, I was -- I was

6    asked by Captain Weaver to file an incident report because of

7    the abuse allegations.

8        Q.    Very good.    Now, you understand that Mr. Fleming

9    has accused you in this lawsuit of maliciously and

10   sadistically trying to trip him and of having actually kicked

11   him in his right ankle, correct?

12       A.    Yes, sir.

13       Q.    What if anything do you have to say to the Court

14   about that accusation?

15       A.    It's false, ma'am.

16       Q.    After you took Mr. Fleming to the law library, who

17   uncuffed him?

18       A.    I did, sir.

19       Q.    What was Mr. Sullivan doing at the time?

20       A.    He was running the video camera.

21       Q.    When you uncuffed him, what if anything did you

22   see Mr. Sullivan do?

23       A.    I didn't see Mr. Sullivan do anything, he was

24   behind me.

25       Q.    Did you see him have any contact at all with the

1    wicker?

2          A.    No, sir.

3          Q.    Did you have any more contact with Mr. Fleming

4    that day after he was placed in the law library?

5          A.    Yes, sir, we later escorted him from the RHU law

6    library to his cell.

7          Q.    At some point did you exchange any words with him

8    while he was in the law library?

9          A.    Yes, sir, I walked back past the RHU law library

10   to perform some of my other duties and he was in the RHU law

11   library.  He said some comments to me.  I'm not exactly sure

12   now what they were, and then he spit on the window directly in

13   front of my face.

14         I reported that to the sergeant, who reported to the

15   lieutenant and decided to escort him back to the cell.  And

16   when we did so, he made several other comments during the

17   escort, comments that he would spit on other officers, used a

18   bunch of vulgarities, and said he would spit on me as well.

19   He was escorted back to his cell without incident.

20         Q.    Who was the sergeant?

21         A.    That would be Sergeant Eddy, sir.

22         Q.    He's now a lieutenant I believe?

23         A.    Yes, sir.

24         Q.    What if anything did you do as a result of those

25   events?

1    A.    I wrote him up for a misconduct, for assault on

2    me.   There was one misconduct on three charges, assault, using

3    abusive language to an employee and threatening an employee

4    with bodily harm.

5    Q.    Do you recall what the outcome of that misconduct

6    was?

7    A.    No, sir, I don't.

8    Q.    Do you have any reason to believe he was not found

9    guilty of that misconduct?

10    A.    No, sir, I don't.

11    MR. MERICLI:   I have no further questions, thank

12    you.

13    JUDGE BAXTER:   Thank you.

14

15    REDIRECT EXAMINATION

16    BY MR. FLEMING:

17

18    Q.    I'd like to redirect you back to the law library.

19    Before this spitting incident, before the -- before all this

20    occurred while you was taking me to the law library, you don't

21    recall doing anything to the plaintiff?

22    A.    No.

23    MR. FLEMING:  Your Honor, can I see my last --

24    last exhibit?

25    JUDGE BAXTER:  Did you --

1        MR. FLEMING:   The one with --

2        JUDGE BAXTER:   Which one?

3        MR. FLEMING:   The Inmant Abuse Allegation

4    Monitoring.

5        JUDGE BAXTER:   You have it.   I gave it back to him

6    and he handed it back to you.

7        MR. FLEMING:   All right.

8        JUDGE BAXTER:   That's a packet there that has been

9    marked Defendant's Exhibit "E".   You can take a minute.   It's

10   there somewhere.

11       MR. FLEMING:   I think --

12       JUDGE BAXTER:   It's actually a copy Mr. Mericli

13   gave him but not marked Exhibit "E".

14       MR. FLEMING:   I think my exhibits are still up

15   there.

16       JUDGE BAXTER:   Your exhibits are, but what you

17   handed me earlier to look at was not your exhibit.

18   MR. FLEMING:   It's in there.

19       JUDGE BAXTER:   In "E"?

20       MR. FLEMING:   It's the last -- It's number nine.

21       JUDGE BAXTER:   Number nine?

22       MR. FLEMING:   Yeah.

23       JUDGE BAXTER:   All right, that's not what I had in

24   my hand last time.

25       MR. FLEMING:   Yeah, that's it.

1           JUDGE BAXTER:  That's the procedures.

2           MR. FLEMING:  Yeah, that's it.

3           JUDGE BAXTER:  I'm sorry, I misunderstood you.

4       MR. FLEMING:  Thank you.

5    BY MR. FLEMING:

6        Q.  So you state that you walked by the law library

7   and as soon as I seen you I just ran and spit on the window?

8        A.  No, you made some comment to me I was doing

9   something else at the time and you got my attention.

10       Q.  As soon as I seen you I came and made the comment

11  and then spit on the window?

12       A.  Correct.

13       Q.  You did nothing to me to provoke me to act in that

14  manner?

15       A.  Correct.

16       Q.  I have a abuse allegation -- I have the DC-ADM

17  001.  Are you familiar with that?

18       A.  Yes.

19       Q.  How many days did it take to you fill out a

20  DC-121?

21       A.  I believe it was six days.

22       Q.  And you're familiar with the DC-ADM 001?

23       A.  Yes.

24       Q.  I would like to read something to you.  I'm going

25  to go to six, procedure.  This is my exhibit, Exhibit 9, page

1   three.   Page three, I'm going to read you the procedure on

2   page three, 6-C, "Reporting of Inmate Abuse Allegations All

3   Persons Who Are Employed by the Department.   Any employee

4   receiving written or verbal notification from a inmate or

5   third party alleging an incident of abuse, or who is a witness

6   to an abuse, is required to complete a DC-121 part three,

7   Employee Report of Extraordinary Occurrence for submittal to

8   his/her supervisor and the facility's Grievance Coordinator.

9   All reports shall be completed prior to the completion of the

10  employee's duty shift."

11         I'd like to ask you, what was your justification for

12  taking, what was it, five days or six?

13         A.   Six days.

14         Q.   Six days for not filling out this report?

15  MR. MERICLI:   Objection, argumentative.   The witness has

16  already testified on that subject.                  JUDGE BAXTER:

17  In his direct questioning from Mr. Mericli he did testify

18  directly on that.   If you want to make a point, you can say,

19  was it your testimony that?   I'll allow that.   Objection

20  overruled.

21  BY MR. FLEMING:

22         Q.   Okay, I would like to make the point that before

23  this incident of spitting occurred that I was provoked by

24  being assaulted by this officer on my way to the law library

25  --

1          MR. MERICLI:  Objection --

2          JUDGE BAXTER:  You can't testify to that.  You're

3    not on the stand to make that testimony.  You can ask a

4    question of this witness, but you can't testify from the

5    counsel's chair.

6          MR. FLEMING:  Okay.

7    BY MR. FLEMING:

8          Q.    Who was your immediate superior?

9          A.    Sergeant Eddy.

10         Q.    Who was Sergeant Eddy's immediate superior?

11         A.    I believe that day it was Lieutenant Morrow.

12         Q.    Lieutenant Morrow?

13         A.    I believe, yes.

14         Q.    What was -- How long -- What was his shift hours?

15         A.    My shift hours was six to two.

16         Q.    Lieutenant Morrow's?

17         A.    I'm not familiar with Lieutenant Morrow's daily

18   schedule.  I couldn't tell you that day.

19         Q.    So you don't know the time of day when you see him

20   when you come in and when you leave?

21         A.    The RHU Lieutenant has gone through several

22   changes.  I can't tell what you his daily hours of operation

23   were at that time.  I don't remember.

24         Q.    When do you normally see him?

25         A.    I saw him intermittently throughout the day.

1    Sometimes they work seven to three.   Sometimes two to 10.

2    Sometimes eight to four.   And it depends on the day.   And it

3    depends on their schedule at the time.

4        I can't sit here and tell you what days he was working

5    and what times he was working that day.

6        Q.   Can you tell me on the exact date of the incident

7    that you seen him?

8        A.   No, I can't tell you exactly when I saw somebody,

9    when I see them.   Sometimes one time a day, and sometimes 50

10   times a day.   It varies every day.

11           MR. FLEMING:   Your Honor, may I approach the

12   witness?

13           JUDGE BAXTER:   For with a purpose?

14           MR. FLEMING:   Of giving him a date, the exact date

15   that he seen Lieutenant Morrow come in, and the exact date --

16           JUDGE BAXTER:   Are you going to show him a

17   document to refresh his recollection?   You can approach the

18   witness.   When you ask to approach, I don't know if you're

19   going to give him coffee or what, so that's why I ask.

20           MR. FLEMING:   Okay, I got you.

21   BY MR. FLEMING:

22       Q.   Can you review this and see if that's yours

23   (indicating)?

24       A.   Yes, that's mine.

25       Q.   I have here -- I have asked you a question, number

1    4-B --

2            MR. MERICLI:  Your Honor, I'm going to object to

3    the relevance of this inquiry.

4            JUDGE BAXTER:  Well, first of all, he's shown --

5    What document did you show him for the record, so the record's

6    reflecting what you showed him?

7            MR. FLEMING:  I showed him this right here

8    (indicating).

9            JUDGE BAXTER:  Yes, what is that?

10           MR. FLEMING:  This is his interrogatories and

11   production.

12           JUDGE BAXTER:  And you showed him the whole thing?

13           MR. FLEMING:  Yeah.

14           JUDGE BAXTER:  And you have a question on that?

15         MR. FLEMING:  Yeah, yes.

16           JUDGE BAXTER:  Do you now recall the date or the

17   time you saw Mr. Eddy, is that the question?

18           MR. FLEMING:  Lieutenant Morrow.

19           JUDGE BAXTER:  Lieutenant Morrow, I'm sorry.

20         CLERK:  Is that document "J"?

21           JUDGE BAXTER:  It's not a marked document.

22           CLERK:  Is that Exhibit "J"?

23           JUDGE BAXTER:  He doesn't have it marked.

24   MR. FLEMING:  These are my documents.  You don't have it

25   marked?

1     MR. MERICLI:  I believe it's Exhibit "J".

2   JUDGE BAXTER:  It is Exhibit "J"?

3     MR. MERICLI:  Yes, and I would renew my objection,

4   your Honor, with all due respect.    JUDGE BAXTER:  Let's

5   ask you that question.  There's an objection on the floor.

6   What is it?  Where are you going with this?  Why do you want

7   to know when he saw Mr. Morrow?  Is it Morrow or Moore?

8     MR. MERICLI:  Morrow.

9     JUDGE BAXTER:  Morrow, all right.

10    MR. FLEMING:  Because this is going to help me

11  establish that my actions was as a result of this officer

12  assaulting me by the -- because the lieutenants are immediate

13  superiors and they're the ones that get the information first.

14    And I can establish that not only was Lieutenant Morrow

15  there, but they also used Lieutenant -- Another lieutenant,

16  Lieutenant Jones, to help concoct the story.  This is the

17  second shift lieutenant, Lieutenant Jones.  Lieutenant Morrow

18  is the first shift lieutenant.         JUDGE BAXTER:  You're

19  going to try to get testimony by showing that he talked to

20  Lieutenant Morrow at some point on the day of the 14th?

21  You're going to then go down the road where you're going to

22  try to extract testimony, where they concocted a story about

23  the incident?      MR. FLEMING:  With the second shift

24  lieutenant, Lieutenant Jones.

25    JUDGE BAXTER:  With Lieutenant Jones.  I will give

1    you some leeway to ask those questions.  Mr. Mericli, your

2    objection is overruled.  But I'm putting a tight rein on you

3    on that one.

4              MR. FLEMING:  All right.

5              JUDGE BAXTER:  We're not going to spend the day

6    trying to get that testimony out of this witness.

7              MR. FLEMING:  Okay.

8    BY MR. FLEMING:

9         Q.   So you state here in your interrogatories of

10   production that Lieutenant Morrow was your immediate superior

11   and he was working from 06:00 hours to 14:00?

12        A.   Okay.

13        Q.   Is that correct?

14        A.   If I wrote it down, yes, it's correct.

15        Q.   It's under oath.  So this was the only lieutenant

16   that you came in contact with during that day?

17        A.   He was the RHU lieutenant assigned to my shift

18   that day, correct.

19             MR. FLEMING:  Your Honor, may I approach the

20   witness to show that this officer was dealing with another

21   lieutenant at the time of the spitting incident, a second

22   shift lieutenant?

23             JUDGE BAXTER:  You may.  You may approach the

24   witness.  Are you showing him the same document from

25   Defendant's Exhibit "J"?

1      MR. FLEMING:  No, this is Captain Weaver's

2  interrogatory where everything, it's more detailed.

3  JUDGE BAXTER:  We're back at "E"?  Is that "E"?        MR.

4  MERICLI:  I'm going to object, your Honor, he's trying to

5  impeach him with Lieutenant Jones's report.  It's not his

6  report, and it doesn't have anything to do with anything he

7  wrote.

8      JUDGE BAXTER:  But if the report reflects that he

9  spoke with him, that's what it will establish.

10      MR. MERICLI:  Then I'm also --

11      JUDGE BAXTER:  Is your objection hearsay or

12  relevance?

13      MR. MERICLI:  My objection is first it is improper

14  impeachment.  If it's going to be allowed in view of the

15  nature of --

16      JUDGE BAXTER:  I don't think he's impeaching him.

17  I think he's still trying to get in this line of questioning.

18      MR. MERICLI:  If he's trying to get in this line

19  of questioning with regard to Lieutenant Jones's opinion, then

20  my objection becomes relevance, because I don't think it has a

21  lot to do with anything.

22      JUDGE BAXTER:  I will overrule the objections

23  both, first of all on improper impeachment because it's not

24  the Court's understanding you're trying to impeach him because

25  he only spoke to one lieutenant, if that's what you're trying

1    to do.  Then we'll come to that, and that will be a renewed

2    objection.

3            The second objection I'm also overruling because I'm

4    giving you some leeway to go down this road.  Relevance is

5    shaky at this point, so let's keep going.

6            MR. FLEMING:  Okay

7    BY MR. FLEMING:

8        Q.    I'd like to show you this DC-121 extraordinary

9    report (indicating).  Can you explain to the Court whose

10   report that is?

11       A.    This would be Lieutenant Dave Jones's report.

12       Q.    Can you explain to the Court what shift this

13   officer assigned is?

14       A.    Two to 10 RHU lieutenant.

15       Q.    Can you explain to the Court the time of the

16   spitting incident?

17       A.    It says 13:25.

18       Q.    That's one o'clock?

19       A.    One twenty-five, yes.

20       Q.    What time does that paper there say (indicating)?

21       A.    That's what time it says.

22       Q.    What time is second shift?

23       A.    Two to 10, 14:00 to 22:00.

24           MR. FLEMING:  No further questions.  I'd like to

25   have that moved into evidence.

1              JUDGE BAXTER:  It already is in evidence.

2    MR. FLEMING:  All right.

3              JUDGE BAXTER:  No further questions of this

4    witness?  All right, Mr. Mericli?

5              MR. MERICLI:  I have some brief questions.

6    JUDGE BAXTER:  All right.

7

8     RECROSS-EXAMINATION

9    BY MR. MERICLI:

10

11        Q.    Mr. Tiller, do you recognize that (indicating)?

12        A.    Yes, sir.

13        Q.    What is it?

14        A.    That is the misconduct I wrote on inmate Fleming

15   for assault, for threatening an employee or their family with

16   bodily harm --

17              JUDGE BAXTER:  You know, she is a miracle worker

18   as it is just getting down my speedy speech, but that was a

19   record there.  That was really good.  You'll have to slow

20   down.

21        A.    Sure.  And it's for using abusive, obscene or

22   inappropriate language to an employee.

23        Q.    This is the misconduct you wrote on Fleming after

24   he spat on the window?

25        A.    Yes, sir.

1    Q.    What if anything did your decision to file this

2    misconduct have to do with the fact that Mr. Fleming had been

3    working on a civil rights complaint against Superintendent

4    Wolfe, Deputy Kormanic, Deputy Marquardt, Mr.  Boeh, Mr.

5    Barnett, Mr. Skendall, Mr. Barr and Mr. McCarthy?

6    A.    None, sir.

7    Q.    Did you even know that he had been working on such

8    a document?

9    A.    I knew he was working on legal material, that's

10   why we were taking him back to the RHU mini law library.

11   However, I didn't know what the matters were pertaining to.

12   Q.    Did you know whether or not he had filed a suit in

13   court of the sort I just described on May 14th, 2002?

14   A.    No, sir.

15            MR. MERICLI:  I have no further questions.

16   Thank you, sir.

17            MR. FLEMING:  So can I go back to the document --

18            JUDGE BAXTER:   No, the way it works is now you can

19   only ask questions pertaining to the questions he just asked.

20            MR. FLEMING:  All right.

21            JUDGE BAXTER:  It keeps getting narrower and

22   narrower.  That's so we don't spend three weeks here.

23   MR. FLEMING:  All right.

24

25   FURTHER REDIRECT EXAMINATION

1    BY MR. FLEMING:

2

3        Q.    So you said that you knew that I was doing some

4    type of legal work while he was taking me to the law library;

5    is that correct?

6        A.    That's correct.

7        Q.    But you didn't exactly know what kind of work it

8    was?

9        A.    That's correct.

10       Q.    But you knew that I was doing some legal work?

11       A.    Correct.

12            MR. FLEMING:   No further questions.            JUDGE

13    BAXTER:   Thank you.   You are finished and so you're excused

14    from the witness stand.   Thank you very much, Mr. Tiller.

15            THE WITNESS:   Thank you.

16            JUDGE BAXTER:   We're going to take a 15 minute

17    recess, morning recess, until 11:15 and we'll be back then and

18    you can call your next witness.

19            (At which time, 11:05 a.m., a recess was taken
              and proceedings resumed at 11:20 a.m.)
20

21            JUDGE BAXTER:   All right, you may call your next

22    witness, Mr. Fleming.

23            MR. FLEMING:   Correction Officer Sullivan.

24

25        B O Y D   S U L L I V A N, first having been duly  sworn,

1    testified as follows:

2

3            CLERK:  Would you please state your full name and

4    spell your last name for the record?

5            THE WITNESS:  My name is Boyd A. Sullivan,

6    S-U-L-L-I-V-A-N.

7            JUDGE BAXTER:  The water is good there if you'd

8    like some.  I see you coughing.

9            THE WITNESS:  Okay.

10

11   DIRECT EXAMINATION

12   BY MR. FLEMING:

13

14           Q.    Good afternoon.  Please, state your name once

15   more.

16           A.    Boyd Sullivan.

17           Q.    Thank you.  How are you employed?

18           A.    I'm a correctional officer at SCI Albion.

19           Q.    How long?

20           A.    It will be 10 years in December.

21           Q.    I'm going to direct your attention back to May

22   15th.  What were your duties that day with the plaintiff?

23           A.    I was assigned to the RHU exercise team in the

24   RHU.

25           JUDGE BAXTER:  May 14th, 2002?

1          MR. FLEMING:  I'm sorry, May 14th, 2002.

2     A.    I was assigned the RHU exercise team.

3     Q.    Describe your duties with the plaintiff, please,

4     on that day with me?

5     A.    I was the cameraman during the escort.

6     Q.    Can you give a little more detail than that?

7     A.    I was the cameraman during the escort with you

8     from your cell to the mini law library.

9     Q.    What did you see during the course of you

10    operating the camera with me?

11    A.    I saw you being escorted from your cell to the RHU

12    exercise -- or the mini law library.

13    Q.    No incidents occurred?

14    A.    I saw you trip on your way to the mini law

15    library.

16    Q.    When we got to the law library can you continue to

17    explain what happened?

18    A.    You were placed in the mini law library and as the

19    door was shut, the camera was shut off.

20    Q.    So this -- This whole incident was suppose to be

21    recorded, was it?

22    A.    Yes, it was.

23    Q.    When did the camera shut off?

24    A.    After you were placed in the RHU mini law library

25    the door was locked, the camera was then shut off.

1    Q.    What do you mean you shut it off or why was it

2   shut off?

3    A.    That's how I do it.  When the door is shut, you

4   are placed in there, the door is shut, I shut the camera off.

5   You were videotaped outside of your cell.

6    Q.    So when I got in, you're saying that you just --

7   that they shut the door with my handcuffs on?

8    A.    Were your handcuffs still on?

9    Q.    Yes.

10    A.    Yes, they were.

11    Q.    Can you explain what happened after that?

12    A.    I don't understand.

13    Q.    After my --

14        MR. FLEMING:  Can I -- Your Honor, can I lead him

15   a little bit?

16        JUDGE BAXTER:  Yes, you may lead the witness, he's

17   a hostile witness.

18        MR. FLEMING:  Thank you.

19    Q.    After I got inside the law library with my

20   handcuffs still on, what happened?

21    A.    You backed up to the wicker to get your hands, you

22   know, to take your handcuffs off.  That's when the camera was

23   shut off.  That's when I shut it off.

24    Q.    Is that the procedure?

25    A.    That's how I do it, yes.

1    Q.    Is that how the procedures tell you to do it?

2    A.    It varies on the cameraman of how they do it.  You

3    are to be videotaped outside of your cell.

4    Q.    I just want to back up a little bit.  You said my

5    handcuffs was still on; is that correct?

6    A.    When you was in the mini law library?

7    Q.    Yes.

8    A.    Yes, they were.

9    Q.    And you said once I get inside the law library the

10    procedure is that with my handcuffs still on I'm on a security

11    camera, that you just shut the camera off?

12    A.    When you are escorted outside of your cell from

13    one room to the other you are videotaped, yes.

14    Q.    I want to go back to the procedure of when I was

15    inside the law library.

16    A.    Okay.

17    Q.    With my handcuffs still on.  You said the

18    procedure is cut the camera off before my handcuffs are

19    removed?

20    A.    Once that door was shut and the door was locked

21    the camera was shut off.

22    Q.    You didn't say anything before the camera shut

23    off?

24    A.    Say anything meaning?  What do you mean?

25    MR. MERICLI:  I object to the form of the question.

1      JUDGE BAXTER:  We've now been through it three

2  times.  I know exactly what happened, because I've heard it

3  now three times.  Let's move on.  He said he shuts the camera

4  off once you're inside the room.  He only tapes when you're

5  outside the room.

6      So you were inside the room and it was locked and it

7  was shut off and your cuffs were on.  I've heard this, so move

8  on.

9  BY MR. FLEMING:

10     Q.   So you don't recall doing anything, whether the

11 camera was shut off or not, you don't recall injuring me in

12 any way?

13     A.   Myself injuring you?

14     Q.   Yes.

15     A.   No.

16         MR. FLEMING:  Your Honor, may I approach the

17 witness to show him an employee incident report?        JUDGE

18 BAXTER:  You may.

19         MR. FLEMING:  This is off of Captain Weaver's

20 report.

21         JUDGE BAXTER:  Captain Weaver's report.

22         CLERK:  Keep your voice up because Mr. Mericli has

23 to hear you, too.

24         MR. FLEMING:  All right.

25         JUDGE BAXTER:  Captain Weaver's report.  And Mr.

1    Mericli, what exhibit is that?

2            MR. MERICLI:  Exhibit "E".

3    BY MR. FLEMING:

4        Q.    Can you name the person who wrote that out?

5        A.    CO1 Sullivan.

6        Q.    Can you state the time?

7        A.    Zero nine fifty.

8        Q.    I just want to go down on that report just a

9    little bit where it says that I begin spitting on the window.

10   Do you --

11           JUDGE BAXTER:  Tell him where to start to read and

12   he'll read.

13       Q.    Okay, I'll show you the question.  Okay, I'll show

14   you right here (indicating).  Start here, "After Fleming."

15       A.    "After Fleming"?

16       Q.    Yeah.  Can you read it out loud?

17       A.    It says, "After Fleming was placed in the law

18   library, he began spitting on the windows.  Lieutenant D.

19   Jones informed Sergeant Eddy to remove Fleming from the law

20   library, and he was escorted back to his cell without

21   incident."

22       Q.    Thank you.  Who was your immediate superior that

23   day?

24       A.    Sergeant Eddy.

25       Q.    Who was Sergeant Eddy's immediate superior?

1      A.    Lieutenant Morrow.

2      Q.    What shift does Lieutenant Morrow work?

3      A.    Six to two.

4      Q.    Here it says -- Here I have where it says

5   Lieutenant Jones informed Sergeant Eddy to remove Fleming from

6   the law library?

7      A.    Yes.

8      Q.    Is that -- Did you write that?

9      A.    Yes.

10     Q.    What shift does Lieutenant Jones work?

11     A.    He works --

12           MR. MERICLI:  Objection, relevance.          JUDGE

13   BAXTER:  Why does it matter?

14           MR. FLEMING:  Because I want -- I'm trying to

15   establish a foundation that these reports are concocted by

16   officers on another shift, and it's in regards to the wicker

17   incident, the spitting incident.

18           JUDGE BAXTER:  But see, the fact -- If he

19   testifies that Lieutenant Jones informed someone to remove

20   you, how does that say it was concocted?

21           MR. FLEMING:  Due to the fact that the second

22   shift Lieutenant Jones, during --

23           JUDGE BAXTER:  Could he have been there by then?

24   Are you saying he wasn't there?

25           MR. FLEMING:  It's impossible for him to have been

1    there, your Honor.

2            JUDGE BAXTER:   Why?  You don't go to work early?

3            MR. FLEMING:   Excuse me?

4            JUDGE BAXTER:   He can't go to work early?

5    MR. FLEMING:  He can go to work early, yeah.            JUDGE

6    BAXTER:   I'm trying to see how that's going to prove your

7    point.

8            MR. FLEMING:   Because it's going to lead me to the

9    incident that I made as to this defendant or this officer

10   assaulting me.  All this happened in the same --          JUDGE

11   BAXTER:  I don't follow.  I'm going to overrule the objection

12   for this reason, because he is trying to I think impeach the

13   witness who wrote down Lieutenant Jones, and he's trying to

14   say that Lieutenant Jones was not the man there.  So for that

15   reason I'll allow it.

16         But the point you say you're trying to make is actually

17   lost on me.  Go ahead.

18           MR. FLEMING:   All right.

19   BY MR. FLEMING:

20       Q.   I would like to present another exhibit which is

21   Exhibit 10 of the law library tape with the medical exam.  I'd

22   like to show that now.

23           JUDGE BAXTER:   Show the tape.  Okay, this is

24   Plaintiff Exhibit Number 10 which is a videotape.  Let the

25   record reflect it's a videotape dated 5-14-02 entitled "Escort

1    to law library and exam in medical triage."

2         Which part do you want to show?  The whole thing?

3         MR. FLEMING:  Right now I just want to show the first

4    segment of the law library incident.

5         JUDGE BAXTER:  Okay.  Do you have a question then

6    for the witness?

7         MR. FLEMING:  Yes, I do.

8         JUDGE BAXTER:  All right.

9         MR. FLEMING:  Can you hold on before you show

10   that?

11   BY MR. FLEMING:

12        Q.    So you said that your procedure is that you shut

13   the video off once I got inside the law library?

14        A.    Yes.

15        Q.    You did it on your own will?  On your own will you

16   shut it down?

17        A.    Yes, I reached up and shut it off, yes.

18        Q.    It never stopped on the -- I was never --

19   JUDGE BAXTER:  You can't testify.  You can only ask him a

20   question.  All right.

21        MR. FLEMING:  Right now I want to show the video.

22        JUDGE BAXTER:  Fine.  Can you see it there on your

23   screen?

24        THE WITNESS:  Yes.

25        JUDGE BAXTER:  Okay.

1              (At which time, the videotape was played.)

2              JUDGE BAXTER:  Do you want to keep going?

3    MR. FLEMING:  I want to you stop it at a certain point, but I

4    think I missed it.

5              JUDGE BAXTER:  Do you want it shown again?

6    MR. FLEMING:  Just a little bit.  Show it -- There's a certain

7    point I want to stop at this time.

8              JUDGE BAXTER:  Can you pause it without going to

9    --

10             CLERK:  No.

11             (At which time, the videotape was played.)

12             MR. FLEMING:  Stop.  Thank you.

13   BY MR. FLEMING:

14        Q.   Did you just see that tape?

15        A.   Yes, I did.

16        Q.   Did you hear that last statement?

17        A.   (No audible answer.)

18        Q.   Can you rewind it one more time?

19             MR. MERICLI:  He's asking if you could hear

20   yourself speaking on the tape?

21             THE WITNESS:  Yes.  Yes, I do.

22        Q.   Yeah, that's cool.  What did you say?

23        A.   I said I would have got it on tape but the battery

24   went dead.

25             MR. FLEMING:  I have no further questions for this

1    CO, your Honor, and I'd like to have that moved into evidence.

2              JUDGE BAXTER:  It is in evidence.  Thank you.

3         MR. FLEMING:  Thank you.

4              JUDGE BAXTER:  Mr. Mericli?

5

6     CROSS-EXAMINATION

7    BY MR. MERICLI:

8

9         Q.   Why was Mr. Fleming on video restriction; if you

10   know?

11        A.   I don't know the main reason, but generally you're

12   put on the camera because you've become a problem inmate in

13   the RHU a numerous amount of times.  It's not a common

14   practice just to be on video just for the sake of being on it.

15        Q.   How unusual is it?

16        A.   There could be -- Well, generally we have 100

17   inmates in the RHU and of those 100 we might have one or two

18   that's on the camera.  Sometimes you might go weeks or months

19   and nobody would be placed on that camera.

20        Q.   Did you think that Corrections Officer Tiller had

21   kicked Mr. Fleming?

22        A.   Do I think he did kick him?

23        Q.   Did you think that at the time?

24        A.   No.

25        Q.   Why not?

1       A.    Because there's no -- He's standing off to the

2  side of him.  There's no, you know.

3       Q.    Were you looking?

4       A.    No, I was looking in the camera.

5       Q.    Did you -- Were you able to observe the movement

6  when he was taken out of his cell and moved into the direction

7  of the law library while were you taping?

8       A.    It -- I could only see from like his waist or like

9  the back of his legs up.  Like I say, I was looking through

10  the camera eyepiece, so whatever I saw --

11       Q.    You've seen the tape here?

12       A.    Yes.

13       Q.    Does it show Mr. Tiller kicking him?

14       A.    No, it doesn't.

15       Q.    Did you see Mr. Tiller kick him?

16       A.    I didn't see him kick him, no.

17       Q.    Do you believe he did?

18       A.    No, I don't believe he did kick him.

19       Q.    Why did you say the battery had gone dead?

20       A.    No reason really, I just --

21       Q.    Teasing him?

22       A.    Yeah, I guess, for worst -- lack of term, just

23  being silly I guess.

24       Q.    Why is it your practice to stop the taping before

25  you uncuff at the library?

1    A.    It's -- He's to be videotaped outside of his cell,

2    outside of his cell and during movement from point "A" to

3    point "B".

4    Q.    So then the movement as you see it had ended once

5    he went inside?

6    A.    Yes, he was behind a secured locked door and

7    that's when I physically reached up and shut the videotape

8    off.

9    Q.    Who uncuffed him?

10    A.    I believe it was Sergeant Tiller.

11    Q.    It's been intimated that Mr. Fleming accuses you

12    of kicking the pie slot or the wicker shut on his wrist.   Did

13    you do that?

14    A.    No.

15    Q.    What would have that required for you to do that?

16    A.    I had the camera.   It would have required me of

17    stepping in between Officer Tiller and Officer Massey, getting

18    in between them and swinging at the wicker with, you know, my

19    foot and kicking it.

20    Q.    Did you do that?

21    A.    No.

22    MR. MERICLI:   I don't have any more questions,

23    your Honor.   Thank you.

24    JUDGE BAXTER:   Thank you.   Mr. Fleming?

25

1    REDIRECT EXAMINATION

2    BY MR. FLEMING:

3

4        Q.    I'd like to redirect you back to your view of

5    operating the video camera.  When you -- So you didn't see as

6    Tiller -- as I stated, kicked me or tripped me?  All you --

7    What -- What part could you see?

8        A.    I could see you from like your waist area up.  I

9    saw you gimping, you know, limping.

10       Q.    So what about from the waist down?

11       A.    I couldn't see it.  Like I said, I had the

12   eyepiece up and I was videotaping you from roughly around your

13   waist area up.

14       Q.    So you didn't -- So you didn't see none of it?

15       A.    None of what?

16       Q.    What I claimed of me being assaulted by Officer

17   Tiller?

18       A.    No.

19       Q.    Okay.  I'd like to redirect you to you said in

20   order for you to be able to get your foot up to the wicker

21   slot you had to step between officers?

22       A.    Yeah.

23       Q.    Okay.  Where were the officers at?

24       A.    (No audible answer.)

25       Q.    You know, was they on your left or was they on

1    your right?

2         A.    They were on the right.

3         Q.    On your right?

4         A.    On my right.

5         Q.    So were you on the left; is that correct?

6         A.    (No audible answer.)

7         Q.    What side were you on?

8         A.    I was at the side of the door with the video

9    camera.

10        Q.    What side, left or right?

11        A.    It depends.  If you're facing the door, I was on

12   the left.

13        Q.    Okay.  That's when you shut the video off?

14        A.    Yes, when you were secured behind the door and the

15   door was locked, the video was shut off.

16        Q.    So the battery never ran out?

17        A.    No.

18             MR. FLEMING:  No further questions.

19

20    RECROSS-EXAMINATION

21   BY MR. MERICLI:

22

23        Q.    You've emphasized today that when you were looking

24   through the eyepiece of the video camera you were focusing on

25   the upper part of Mr. Fleming's body, right?

1    A.    Yes, sir.

2    Q.    But you're not attempting to testify about what

3    the camera may or may not have shown or picked up when you say

4    that, right?

5    A.    Right, I -- Like I said, I'm looking at whatever

6    is through the eyepiece.

7    Q.    So you're testifying to your recollection when you

8    look through the eyepiece, you're not testifying of what

9    appears on the videotape?  What appears on the videotape

10   speaks for itself, right?

11   A.    Yes, sir.

12         MR. MERICLI:  Thank you.

13         JUDGE BAXTER:  All right, you may step down.

14   Thank you very much.

15         You may call your next witness.

16         MR. FLEMING:  Sergeant Eddy.

17         JUDGE BAXTER:  Sergeant Eddy, would you please

18   step up to the witness stand?

19         MR. MERICLI:  May it please the Court, it's

20   Lieutenant Eddy.

21         JUDGE BAXTER:  Lieutenant Eddy, I'm sorry.

22         THE WITNESS:  That's okay.

23         MR. FLEMING:  Mr. Lieutenant Eddy.

24

25         D A V I D  E D D Y, first having been duly sworn,

1    testified as follows:

2

3            CLERK:  Would you please state your full name and

4    spell your last name for the record?

5            THE WITNESS:  David John Eddy.  Last name spelled,

6    E-D-D-Y.

7

8    **DIRECT EXAMINATION**

9    BY MR. FLEMING:

10

11           Q.   Good afternoon.

12           A.   Good afternoon.

13           Q.   Please, state your name again.

14           A.   David John Eddy.

15           Q.   Thank you.  How are you employed?

16           A.   I'm a Lieutenant for the Department of Corrections

17   at SCI Albion.

18           Q.   How long have you been a lieutenant?

19           A.   Two years now.

20           Q.   How long have you been involved in correction, of

21   a institution employment?

22           A.   Eleven years this March.

23           Q.   I want to direct your attention back to May 14th,

24   2002 and the incident with the plaintiff here in the courtroom

25   today.  Can you give some details on what happened?

1      A.    Could you shed light on which incident you're

2  referring to?

3      Q.    With the law library incident.  Do you recall --

4      A.    Yes, I recall that incident.  Approximately --

5      Q.    Can you -- Can you give details on it?

6      A.    Yes, sir.

7      Q.    Thank you.

8      A.    Approximately 13:00 I was about to enter bravo

9  pod, the pod that you lived on.  I had hit the call button to

10 get onto the pod and I had to wait for the control officer let

11 me in.  At that time I observed through the door pane window

12 you being escorted by Officer Tiller, Officer Massey, and

13 Officer Sullivan was on video camera.

14      In that process you tripped yourself up.  And they then

15 escorted you to the door.  And I opened the door, pushed the

16 door open for them and you stated to me, do you see what your

17 officers done?  And I said the only thing I seen was you

18 tripped yourself up and if you keep it up, you'll go back to

19 your cell.

20      Q.    I have a DC-121 report right here from you dated

21 May 15th (indicating)?

22      A.    Correct.

23      CLERK:  Sir, what exhibit is that from?

24 MR. FLEMING:  From Captain Weaver's.          JUDGE BAXTER:

25 Defendant's Exhibit "E".

1    Q.    Did you witness anything in reference to me going

2    inside the law library?

3    A.    No, once you -- once you -- the officers escorted

4    you past me, I went onto bravo pod and continued with my tour

5    of the unit.

6    Q.    So are you saying you just left?

7    A.    No, I'm saying I continued on with my duties and

8    they continued on with theirs, escorting you to the law

9    library.

10    Q.    Explain your duties.

11    A.    I'm -- At that point I was restricted housing unit

12    sergeant, we conduct tours of the unit, we help with escorts

13    when need be, and basically whatever the RHU lieutenant

14    instructs you to do for the day.  Counts, yard exercise lists,

15    various aspects of that.

16    Q.    You said you conduct escorts?

17    A.    On some occasions, yes.

18    Q.    What -- What would you call me going from my cell

19    to the law library on camera?

20    A.    An escort.

21    Q.    And you weren't present?

22    A.    For that escort?

23    Q.    Yes.

24    A.    I was -- No, I was not partaking in that escort, I

25    was doing my tour of the unit.

1    Q.    You said -- You said this entails conducting

2    escorts --

3            MR. MERICLI:  Objection, argumentative.

4    JUDGE BAXTER:  Move on.  That doesn't make any difference.  He

5    says he wasn't part of it.  He says he ran into you, talked to

6    you and then he moved on to other things.  Move on.

7            MR. FLEMING:  Okay.

8    BY MR. FLEMING:

9    Q.    So you say that you witnessed me fooling around?

10   A.    Correct.

11   Q.    And I tripped myself?

12   A.    Correct.

13           MR. FLEMING:  I'd like to present this video and

14   show --

15           JUDGE BAXTER:  All right, let's play the video

16   again.  If you want to stop it at a certain place, make sure

17   you tell Mrs. Wallen.

18           MR. FLEMING:  All right.

19           (At which time, the videotape was played.)

20   Q.    Did you see that?

21   A.    Yes, I did.

22   Q.    From that point there, where did you go?

23   A.    On to bravo pod continuing my tour of the unit.

24   Q.    When did you talk to me?

25   A.    As you were coming outside the door.

1    MR. FLEMING:  Would you rewind that, please?  Can

2 you show me -- Can you stop the tape where were you talking to

3 me at --

4    JUDGE BAXTER:  What's your point?  What's your

5 point?  What do you care?  What's your point?

6    MR. FLEMING:  My point is this officer is

7 committing perjury on the stand.

8    JUDGE BAXTER:  That he didn't talk to you, is that

9 what you're saying?

10    MR. FLEMING:  Yes, I am.  This is --        JUDGE

11 BAXTER:  So your point is simply that he's lying on the stand

12 about that?

13    MR. FLEMING:  Yes, I am.

14    JUDGE BAXTER:  There's no other point you want to

15 make about that for your case?

16    MR. FLEMING:  No, I don't.

17    JUDGE BAXTER:  Show it one more time.

18    (At which time, the videotape was played.)

19    JUDGE BAXTER:  All right.

20    MR. FLEMING:  No further questions.        JUDGE

21 BAXTER:  Mr. Mericli?

22

23  CROSS-EXAMINATION

24 BY MR. MERICLI:

25

1    Q.    How unusual is it for shift lieutenants on the RHU

2  to overlap their shifts?

3    A.    It happens everyday.  The six to two lieutenant

4  works and the one to nine lieutenant comes in.

5    Q.    Are you sure you said quit fooling around --

6    A.    I seen it on the video when they opened the door.

7  I didn't scream it at him.  It was a normal voice, quit

8  fooling around or you'll be back to your cell.  And you could

9  see he turned around to look at me and you could see my lips

10  moving.

11    Q.    Anything further, sir?

12    A.    That's all I have.

13    MR. MERICLI:  Thank you, no further questions.

14    JUDGE BAXTER:  Anything else on redirect?        MR.

15  FLEMING:  No.

16    JUDGE BAXTER:  Thank you, you may step down.  Any

17  other witnesses?

18    MR. FLEMING:  Can I ask a question?        JUDGE

19  BAXTER:  Yes, sir.

20    MR. FLEMING:  Because it's been a long time, who

21  is that guy there (indicating) with the black shirt on?

22    MR. MERICLI:  You can't ask.

23    JUDGE BAXTER:  Call your next witness.

24    MR. FLEMING:  That's what I mean.

25    MR. MERICLI:  Just use a name.

1        JUDGE BAXTER:  Just call a name.  If he's here,

2   we'll bring him up.

3        MR. FLEMING:  Oh, I know who it is.  I'd like to

4   call Maldonado, CO Maldonado.

5        MR. MERICLI:  May it please the Court, it's

6   Maldonado.

7

8        J O S E   M A L D O N A D O, first having been duly

9   sworn, testified as follows:

10

11        CLERK:  Would you please state your full name and

12   spell your last name for the record?

13        THE WITNESS:  Jose R. Maldonado,

14   M-A-L-D-O-N-A-D-O.

15

16   DIRECT EXAMINATION

17   BY MR. FLEMING:

18

19        Q.    Good afternoon.

20        A.    Good morning.

21        Q.    Please state your name once more.

22        A.    Jose R. Maldonado.

23        Q.    Thank you.  How are you employed?

24        A.    I'm a corrections officer, Department of

25   Corrections with SCI Albion.

1          Q.    How long?

2          A.    Five years and eight months.

3          Q.    Okay.  I want to direct your attention to August

4     2nd and --

5                JUDGE BAXTER:  2002?

6                MR. FLEMING:  Yes, 2002.  Can I give him the

7     details?

8                JUDGE BAXTER:  You can lead the witness.

9     MR. FLEMING:  All right.

10         Q.    With the misconduct for --

11               JUDGE BAXTER:  Mr. Maldonado is a defendant?

12     MR. MERICLI:  Yes.

13               JUDGE BAXTER:  You can lead the witness.

14     BY MR. FLEMING:

15         Q.    With the misconduct of breaking a cuff key, are

16     you aware of that?

17         A.    I --

18         Q.    You said I broke a cuff key, along with Officer

19     Davison.

20               JUDGE BAXTER:  Do you recall that incident, Mr.

21     Maldonado?

22               THE WITNESS:  Not clearly.  I remember something

23     happened but I can't remember clearly what.

24               MR. FLEMING:  Your Honor, could you please give me

25     Exhibit 3 so I can --

1      JUDGE BAXTER:  Yes, sir, I will.

2      MR. FLEMING:  Thank you.

3      Q.    (Indicating).  You can look at the front of it to

4  refresh your memory.  It's another one, too.  I think it's

5  Exhibit 4 that I'm going to be coming to shortly.

6      Are you aware of that?

7      A.    I remember it.

8      Q.    Okay.  You were the one that was on camera.  Was

9  that on camera?

10     A.    I don't believe it was on camera.

11     Q.    So you're saying it wasn't on camera?

12     A.    I don't remember.  I don't think so.

13     Q.    All right.  Put that -- There's another one up

14 there, you can put that aside.  I want to come back to that.

15 The August 23rd incident --

16     JUDGE BAXTER:  Let the record reflect that the

17 witness has Plaintiff Exhibit Number 4.

18     Q.    Are you aware of that?  Was that --

19     A.    Yes.

20     Q.    -- Was that on camera?

21     A.    That was one I remember clearly because I was the

22 one running the camera.

23     Q.    But the August 2nd one, that wasn't on camera?

24     A.    I can't remember that one.

25     Q.    Okay.  Can you explain the August 2nd one, the one

1    that you wasn't aware that was on camera?

2            MR. MERICLI:  Objection to the form of the

3    question

4            JUDGE BAXTER:  What are you asking him?  To tell

5    about the incident on August 2nd, 2002?

6            MR. FLEMING:  Yes.

7            JUDGE BAXTER:  Overruled.

8        Q.    Can you tell about the incident?

9        A.    Well, I can remember that, that we handcuffed you.

10    I can't remember if we were going -- you were going to the

11    shower or the yard, but you started acting up.  And we both

12    grabbed hold of the tether and as I put my handcuff key -- my

13    handcuff key to uncuff you, you pulled in and that's when you

14    broke the handcuff key.

15        Q.    Can I see that number 3 once?  Thanks.  You said I

16    broke the handcuff key as you was taking it off?

17        A.    I believe that's how it happened.

18        Q.    Okay.  So you uncuffed me and took them off,

19    right?

20        A.    I tried to.  You broke the key and I can't really

21    tell you if you kept the handcuffs on or I had them.  I can't

22    remember clearly that.  Like I said, I just remember part of

23    it.

24        Q.    You just remember that you uncuffed me?

25        A.    Yeah.

1    Q.    You sure you uncuffed me?

2    A.    Yeah, I believe because it was my handcuff key.

3          MR. FLEMING:  Your Honor, I'd like to show this

4    officer this misconduct (indicating).

5          JUDGE BAXTER:  Go ahead.

6    Q.    That the officer that uncuffed me was not this

7    officer, it was Officer Davison.  Can you read that to the

8    Court, please?  That there (indicating).

9    A.    "On the above date and time while uncuffing inmate

10   Fleming (EM 7566) in his cell, inmate Fleming tried to pull

11   the handcuffs into his cell.  This officer along with CO1

12   Maldonado grabbed the tether and inmate Fleming was unable to

13   get the cuffs.  However, Officer Maldonado's key was broken

14   from inmate Fleming's actions."

15   Q.    Who is the reporting officer?

16   A.    The reporting officer was Officer Davison.

17   Q.    Who was involved in the incident?

18   A.    Officer Davison and myself.

19         MR. FLEMING:  No further questions.

20

21    CROSS-EXAMINATION

22   BY MR. MERICLI:

23

24   Q.    Whose key does Davison say was broken in the

25   report?

1    A.    Officer Maldonado.

2    Q.    That's you?

3    A.    Yes, sir.

4    Q.    And that's just what you testified to as well?

5    A.    Yes, sir.

6    Q.    Okay.  Did you recently have an occasion to view a

7    videotape of an incident in which you and Officer Davison was

8    again teamed to escort Mr. Fleming to the RHU exercise yard at

9    Albion?

10    A.    Yes, sir.

11    Q.    Okay.  Do you remember what happened on that

12    occasion?

13    A.    Well, we got to -- I was the videotaping Officer

14    -- Officer Harmon and Officer Davison were doing an escort.

15    We got him cuffed, went to the yard and we opened the gate,

16    the yard gate.  And he turned around, he pulled the tether out

17    of Davison's hands, turned around and kicked the gate.

18    Q.    That's what the video will show if the Court --

19    when the Court has an occasion to look at it?

20    A.    Yes.  Yes, sir.

21    Q.    Okay.  Was a misconduct written on that?

22    A.    Yes.

23    Q.    You didn't write it though, did you?

24    A.    No, I believe it was Officer Davison because he's

25    -- The gate hit him in the hand.

1    Q.    Now you appeared as the witness on this misconduct

2    involving the broken cuff key, correct?

3    A.    Yes, sir.

4    Q.    Do you know whether you were listed as a witness

5    on the assault on corrections Officer Davison or not?

6    A.    I believe I was.

7    Q.    Is there any truth to the assertion that's been

8    made by Mr. Fleming that Mr. Davison slammed the gate into his

9    elbow?

10    A.    No, he didn't slam the gate.

11    Q.    In fact it was the other way around, he kicked the

12    gate onto Davison's hand?

13    A.    He kicked the gate.

14    Q.    Did you know at the time that event happened that

15    he had filed suit against a group of SCI Albion's -- and I'm

16    going to call them higher ups, top brass, three months

17    earlier?

18    A.    No, sir.

19    Q.    Did that play any role in either occasion?  Did

20    you discuss that with Davison in either event?

21    A.    No, sir because I didn't know.  I didn't know he

22    was doing that.

23    Q.    Davison didn't talk to you about it?

24    A.    No.

25    Q.    Do you have any reason to think that Davison knew

1    about it?

2         A.    I can't tell you about him.  He never talked to

3    me.

4         Q.    But you had no reason to know -- He didn't give

5    you any indication?

6         A.    No, he didn't.

7              MR. MERICLI:  No further questions.  Thank you,

8    sir.

9              MR. FLEMING:  May I see that August --      JUDGE

10   BAXTER:  Exhibit 3 or 4?

11             MR. FLEMING:  Exhibit 3 again, please.  Thank you.

12

13    REDIRECT EXAMINATION

14   BY MR. FLEMING:

15

16        Q.    So this here -- This Exhibit 3 here was no

17   videotape of this incident?

18        A.    That's the one with the handcuff key?

19        Q.    Yes.

20        A.    Like I said before --

21        Q.    No videotape?

22        A.    Like I said before --

23        Q.    So you saying I was out my cell without being on

24   video camera?

25        A.    No, I didn't say you were out of your cell.  I

1    never said that.  I said we went to your cell, we handcuffed

2    you.  I don't know if we were going to the yard or to the

3    shower.  You started acting up, and that's when we decided to

4    take the handcuffs off, and that's when I put the cuff key in

5    and you pulled away and broke my cuff key.

6         Q.    Okay.  So you didn't give no report of that

7    incident, did you?

8         A.    I don't remember, I can't remember.

9             MR. FLEMING:  No further questions.          JUDGE

10   BAXTER:  Thank you, you may step down Officer Maldonado.

11            THE WITNESS:  Thank you.

12            JUDGE BAXTER:  Next witness.

13            MR. FLEMING:  I'd like to call Captain Robinson to

14   the stand.

15            JUDGE BAXTER:  Is it Robertson or Robinson?

16            THE WITNESS:  Robinson.

17

18        T H E O D O R E  R O B I N S O N, first having been

19   duly sworn, testified as follows:

20

21            CLERK:  would you please state your full name and

22   spell your last name for the record?

23            THE WITNESS:  Theodore W. Robinson, III,

24   R-O-B-I-N-S-O-N.

25

1    DIRECT EXAMINATION

2    BY MR. FLEMING:

3

4        Q.    Good afternoon.    Please state your name one more

5    time.

6        A.    Theodore W. Robinson, III.

7        Q.    How are you employed?

8        A.    I'm a Lieutenant with the Department of

9    Corrections at SCI Albion.

10       Q.    How long?

11       A.    January it will be 12 years.

12       Q.    I'd like to direct your attention to August 23rd,

13   2002.  Can you give some details of this incident with

14   Maldonado and Davison for a assault you investigated and gave

15   me a misconduct for lying?

16       A.    You're referring to the grievance?

17       Q.    Or the grievance.    Misconduct or grievance.

18       A.    Okay.  You had filed a grievance stating that you

19   had been assaulted.  Mr. Barr, the Superintendent, as the

20   grievance coordinator, assigned me the duties of following up

21   on that grievance.  As a matter of investigating that

22   grievance, I reviewed the tape, I discussed with the security

23   office the best way to approach it.  I also talked to the

24   staff involved, and also talked to you.

25       Q.    So this incident is videotaped?

1    A.    Yes, there was a videotape.

2    Q.    And everything in your report is true?

3    A.    Everything is true.

4          MR. FLEMING:  Can you put this video in, please?

5          JUDGE BAXTER:  Is that "B"?

6          MR. MERICLI:  Yes, your Honor.

7          MR. FLEMING:  This is the second one.

8          MR. MERICLI:  Yes.

9          (At which time, the videotape was played.)

10          MR. FLEMING:  Can I get Exhibit 5, please?

11   JUDGE BAXTER:  Exhibit 5?

12          MR. FLEMING:  Yeah.  Thank you.

13   BY MR. FLEMING:

14    Q.    Okay, I have here the misconduct that you gave me

15   where you state that "In the course of the factfinding it was

16   discovered by observing a videotape of the said incident that

17   inmate Fleming knowingly lied in his grievance.  The videotape

18   clearly shows inmate Fleming entering the RHU yard pen,

19   turning and then kicking the gate shut with his right foot,

20   thus a assaulting the officer.  Fleming clearly knew he had

21   kicked the gate and that an officer had not assaulted him."

22          Can you state that's your writing?

23    A.    That would be correct.

24    Q.    Okay.  So did you see the gate shut on -- Did you

25   see the gate fully once I got inside the yard through the

1   camera?

2       A.   Can you say that again?

3       Q.   Did you see -- Did you see the gate, the area

4   fully, the area as you walking inside, as you walking inside

5   the gate, before you turn, did you --

6       A.   You can see the gate.

7           JUDGE BAXTER:  Are you saying this gentleman was

8   there?

9           MR. FLEMING:  No, he was investigating.

10  JUDGE BAXTER:  All right, so you're talking about on the

11  screen did he see it?

12          MR. FLEMING:  Right.

13          MR. MERICLI:  Your Honor, I would object.  I think

14  the tape speaks for itself.

15          JUDGE BAXTER:  The tape speaks for itself, yes.

16  Sustained.  Go on.

17          MR. FLEMING:  So I got to keep going?  Can't go

18  back to that?

19          JUDGE BAXTER:  Keep going.

20  BY MR. FLEMING:

21      Q.   So what you saying you seen -- Are you saying you

22  seen the assault and I turned and kicked the gate, right?

23      A.   No, I did see an assault.  You assaulted by

24  kicking door and hitting the officer in the arm.

25      Q.   Did you actually see the door hit the officer in

1    the arm?

2        A.    Yes, I did.

3            MR. FLEMING:  Can you rewind the tape again,

4    please?  I'll let you know when to stop.

5            (At which time, the videotape was played.)

6            MR. FLEMING:  Stop.  Thank you.

7        Q.    Did you just see that?

8        A.    Yes, I did.

9        Q.    Was the officer hit in the arm?

10       A.    Yes, he was.

11           JUDGE BAXTER:  All right that's the last time you

12   ask that question.  He's answered it twice.  You can disagree

13   with him, but you can't keep going over and over it.  Let's

14   move on.

15           MR. FLEMING:  All right, I'll move on.

16       Q.    All right.  So you gave me a misconduct for lying

17   to an employee.  Was there any medical reports or anything

18   filled out for this officer arm being hurt?

19       A.    I do not know.

20       Q.    Well, how did you know his arm was hurt?

21       A.    By observing the tape.

22           JUDGE BAXTER:  What was the misconduct for?

23           THE WITNESS:  Lying.

24           MR. FLEMING:  Lying to an employee.        JUDGE

25   BAXTER:  Go ahead.

Q.    So you saying that you knew the officer's arm was hurt just by looking at the tape?

MR. MERICLI:  Your Honor, I'm going to object.  I think this is irrelevant.  He wrote him up for lying about the incident.  He didn't write him up for an assault.

JUDGE BAXTER:  Sustained.  Move on.

MR. FLEMING:  Okay.

JUDGE BAXTER:  I've given you a lot of leeway this morning, but my hair is getting grayer as we go along.  Move along.

Q.    In your investigation reports of this incident right here -- In your investigation report of this incidents right here you state that Fleming -- that Fleming knew -- Fleming kicked the gate and that the officer had not assaulted him.  You did see me kick the gate?

A.    Yes, I saw you kick the gate.

Q.    But you didn't know -- But you didn't know why I kick it, you just seen me kick it?

A.    I know that the officers did not do anything on the tape.  I also saw you kick the gate.  Therefore, you knew that you did not get assaulted by the officers.

Q.    Did you read the grievance?

A.    Yes, I read the grievance.

Q.    Can you explain to the Court what the grievance said?

1      A.   The grievance reported that you had been assaulted

2  by Officer Davison.

3      Q.   And that's it?

4      A.   That's all I recall at this time.

5      MR. FLEMING:  All right, no further questions.

6      MR. MERICLI:  Thank you.  I have no questions of the

7  witness.

8      JUDGE BAXTER:  You may step down, Officer

9  Robinson, thank you.

10      THE WITNESS:  Thank you.

11      JUDGE BAXTER:  Next witness, Mr. Fleming.  We're

12  going to go for 10 more minutes before a lunch.

13      MR. FLEMING:  I can get one more?      JUDGE

14  BAXTER:  Yes.

15      MR. FLEMING:  I'm going to go to go with -- Do you

16  feel you're on Price is Right?  Mr. Klos, come on down.

17

18      D O N A L D  K L O S, first having been duly sworn,

19  testified as follows:

20

21      CLERK:  Would you please state your full name and

22  spell last name for the record?

23      THE WITNESS:  Donald J. Klos, K-L-O-S.

24      JUDGE BAXTER:  A-S?

25      THE WITNESS:  O-S.

1    MR. FLEMING:  Okay, that's good enough for me.

2    Excuse me.

3

4    **DIRECT EXAMINATION**

5    BY MR. FLEMING:

6

7    Q.   I'd like to direct your attention to -- First of

8    all, how are you employed?

9    A.   I'm employed as a registered nurse in the

10   infirmary at SCI Albion.

11   Q.   How long have you been a registered nurse?

12   A.   About 16 years.

13   Q.   I want to direct your attention to May 14th, 2002

14   and your medical examination of the incident prior to.  Can

15   you give some details on that?

16   A.   I need some type of documentation.  I haven't seen

17   anything since 2002.

18   MR. FLEMING:  Can I give it to him?        JUDGE

19   BAXTER:  Yes, you may approach the witness with an exhibit.

20   MR. FLEMING:  I'm giving him Captain Weaver's

21   interrogatories.

22   JUDGE BAXTER:  Defendant's Exhibit "E".

23

24   A.   Well, I recognize the top of the page, it is my

25   own handwriting, this incident, medical incident/injury

1    report.  Which one do you want me to use?  Captain Weaver's or

2    the one I wrote myself?

3        Q.    I think it would be wise to use yours.

4        A.    Okay, medical incident/injury report, written by

5    myself on May 14th of 2002 at 1:45 in the RHU concerning Mr.

6    Fleming.  In A-8 cell I examined Mr. Fleming.  I examined

7    Inmate Fleming EM-7566 for injuries that he claimed he

8    sustained by the correctional officers during movement from

9    RHU B-8, his RHU cell, to the law library."

10        During my examination -- According to my examination,

11    "No injuries were noted to the inmate."  Also "All portions of

12    the examination were videotaped."

13        Q.    When you were giving me the examination, can you

14    explain in detail what you checked?

15        A.    Per se examination I don't remember exactly what

16    -- How -- What exactly during the examination.

17        Q.    The document is right there.

18        MR. MERICLI:  Are you asking him to -- Excuse me,

19    are you asking him to -- May I ask the Court, is he asking him

20    to read the initial impression, illness and injury portion of

21    the report?

22        JUDGE BAXTER:  Is that what you want?

23        MR. FLEMING:  Yeah.

24        JUDGE BAXTER:  Do you want him to try to recall

25    what he did?

1          MR. FLEMING:  Yeah.

2          MR. MERICLI:  There's a portion of the report,

3 it's denominated number two, it's called initial impression,

4 illness and injury.

5          JUDGE BAXTER:  Is that somewhere in that packet?

6          MR. MERICLI:  Yes, I would show it right here

7 (indicating).

8          MR. FLEMING:  It's up there, the same thing.

9     A.   This is the actual medical incident injury report,

10 the department of corrections and it's such that I can't read,

11 et cetera.  I quoted Mr. Fleming, I can't read the -- If it

12 can be brought down just a little bit.

13          MR. MERICLI:  Okay?

14          THE WITNESS:  From the top page down where I can

15 read it.

16          MR. MERICLI:  How about that?

17          THE WITNESS:  Thank you.

18          MR. MERICLI:  Would you like me to given you a

19 copy of the actual document?

20          THE WITNESS:  Yes, sir.

21          JUDGE BAXTER:  Keep it up there.  No, you're going

22 to give him that copy, never mind.

23          THE WITNESS:  Thank you.

24     A.   I quoted the incident injury report concerning the

25 5-14 incident that occurred at 13:00 hours.  The exact

1   location of the incident injury was the RHU law library.  I

2   quoted Mr. Fleming, "The guards hurt my wrist and ankle taking

3   me to the law library."  Quote/unquote.  He complained of

4   right wrist being quote slammed through the wicker.  Unquote.

5   And then he complained of the guard tripped me.  Unquote.

6       I took his vital signs.  Again, his respiration was 16,

7   pulse was 76.  124 over 88 was his blood pressure at the time.

8   When I examined him he complained of injury to right wrist and

9   right ankle.  Right ankle there was no deformities noted.  He

10  was warm and dry.  Had positive pedle pulse, positive

11  capillary reflex in his feet.  There's no deformities noted.

12  The skin was intact.

13      I didn't notice any -- There's no noted swelling,

14  redness, abrasions, lacerations, et cetera, noted.  He

15  complained of right -- Excuse me, he complained of pain in his

16  right lateral aspect of his ankle.  There was no -- Again, no

17  swelling, no indication of any injury at that aspect of his

18  body.  His plantar dorsiflexion -- As part of the assessment

19  he took his foot and raised and lowered it.  There's no

20  indication of any problems with movement.

21      Q.   No signs of pain or nothing?

22      A.   Just a subjective response by you, that you had

23  pain.  There's no objective physical symptoms that you had

24  incurred any type of injury on your right ankle.

25      Q.   Did I react when you moved it?

1      A.    From my report, no, sir, you didn't.  You

2  complained of right wrist pain at the lateral aspect of the

3  right wrist.  You complained of -- Your objective response was

4  you complained of a constant sharp, throbbing pain in the

5  right wrist.  The right wrist was examined.  I found your skin

6  integrity intact, it was warm, it was dry to touch.  No

7  lacerations, abrasions, et cetera, were noted.  No swelling or

8  deformities.  You flexed your fingers well, et cetera.

9      Other than your subjective response that it was causing

10  you some discomfort, I didn't note any physical symptoms

11  associated with it.  I didn't respond with any type of

12  treatment because there was no type of injury I physically

13  assessed.

14      And you verbalized an understanding of that, for

15  further assessment and further evaluation or injury, you

16  needed to place a sick line slip.

17      Q.    Did you freely check the injuries that I claimed I

18  sustained?  Meaning when I say freely, I mean with no objects

19  hindering you from fully checking the injuries?

20      A.    There was no coercion or any type of -- Anything

21  that would prevent me from doing an assessment or --

22          JUDGE BAXTER:  This is on videotape?

23          MR. FLEMING:  Excuse me?

24          JUDGE BAXTER:  This is on videotape?

25          MR. FLEMING:  Yes, it is.

1    JUDGE BAXTER:   Okay.

2    MR. FLEMING:   I think I want to show this.

3  JUDGE BAXTER:   Okay.   The second half?

4    MR. MERICLI:   The second half to tape one.

5    Q.    So you didn't order no treatment or no further

6  nothing after that?

7    A.    No.

8    MR. FLEMING:   Okay, I want to show this tape.

9    (At which time, the videotape was played.)

10    JUDGE BAXTER:   All right we're going to take an

11  hour and a half lunch break.   We'll be back at 2:15.   You

12  are still understand oath.   Do not talk about your testimony

13  while at lunch and you'll come back, still under oath.

14    (At which time, 12:45 p.m., a recess was taken
    and the proceedings resumed at 2:15 p.m.)
15

16    JUDGE BAXTER:   All right, I believe Mr. Klos was

17  on the stand; is that not correct?

18    CLERK:   Yes.

19    JUDGE BAXTER:   Mr. Klos, you're still under oath.

20  Mr. Fleming, you can continue when he's situated.

21    MR. FLEMING:   I'd like to let the tape continue to

22  play through.

23    JUDGE BAXTER:   I thought it was finished.

24  MR. FLEMING:   No, it was like a little bit more.   It was

25  almost done.

1          JUDGE BAXTER:  I'm sorry, I didn't mean to

2    interrupt you before it was done.

3          (At which time, the videotape was played.)

4          MR. FLEMING:  Would you please stop it?  That's

5    all I need.

6    BY MR. FLEMING:

7    Q.    You stated that you didn't feel it was needed to

8    go further with an examination from there?

9    A.    No, the examination was complete by me, I didn't

10   see any need to do anymore medical treatment at that point.

11   Q.    Because that states right there that you said

12   clearly that you will pass on the evaluation.

13   A.    Right.

14   Q.    Can you explain to the Court what you mean by

15   that?

16   A.    I would file the proper forms with security, and

17   with the medical department.  The department of corrections

18   457 form will be passed onto my supervisor.  If there was some

19   pertinent need, I would also contact the physician assistant.

20   Q.    So you felt there was no need to go further with

21   the --

22   A.    At that point, no.

23   Q.    What was it that gave you an indication that there

24   was no need?

25   A.    My nursing assessment of you, there was no --

1   There was no bleeding, bruising, lacerations, no abrasions, no

2   swelling, no redness.  Other than your subjective response to

3   pain, there was nothing to indicate that, that you were

4   injured.

5        Q.    You said that you checked my blood pressure?

6        A.    Yes.

7        Q.    So that's what you saying that it was normal so

8   that was --

9        A.    Your blood pressure wasn't elevated, your pulse

10   wasn't elevated.

11        Q.    So that's -- What is it that gave you the full

12   understanding that it was -- there was no need for you to

13   consider me needing medical attention without --

14        A.    Basically, my experience, my assessment, you did

15   not need at that point any further medical care, you were a

16   non-emergency type of patient.

17             MR. FLEMING:  All right.  Can I get my Exhibit 2,

18   please?  May I approach?

19             JUDGE BAXTER:  Yes, you may.

20             MR. FLEMING:  Thank you.

21             MR. MERICLI:  Excuse me, your Honor, may I just

22   take a quick look at what he's showing the witness?

23   JUDGE BAXTER:  Yes, Exhibit 2 is a big stack of things.  It's

24   a grievance form from Camp Hill.  Another one from

25   Superintendent --

1    MR. FLEMING:  I'm going to use my sick call slip

2  of 7-25-02 with --

3    MR. MERICLI:  Let me take after quick look.

4    JUDGE BAXTER:  It's one, 7-25-02, 5-14-02, one 5-16-02,

5  5-20-02, and 5-21-02.  Are they all there?        MR.

6  MERICLI:  Thanks.

7  BY MR. FLEMING:

8    Q.    Can you look at this and read the complaint to the

9  Court, a signed statement from a doctor that checked me the

10  same way that you did and felt that I needed --        MR.

11  MERICLI:  I object, that's a great deal of testimony about

12  something I don't think we've had any --        JUDGE

13  BAXTER:  Well, I think that he can read it and comment on it.

14  You can ask him a question about it after he reads it, it's in

15  evidence.  It's one of the pages in Plaintiff Exhibit 2.

16    What's the date on that, Mr. Klos?

17    THE WITNESS:  7-25-02.

18    JUDGE BAXTER:  7-25-02?

19    THE WITNESS:  July 25th.

20    JUDGE BAXTER:  When he's done reading it you can

21  ask him a question about it or have him read a portion of it.

22  He doesn't have to read the whole thing.

23    MR. FLEMING:  It's not much, it's just like a

24  couple lines.

25    A.    On 7-25-02 Mr. Fleming submitted a sick line

request, sick call request form.  This is a sick call request

form to the medical department that he -- that his complaint

was that he has put quote unquote, "This is another request

slip to inform you that I put in numerous request slips about

my wrist and ankle.  I was even checked by a doctor on

7-23-02.  He said he was going to sign for me to get some

medication for the pain.  I was charged and he never -- " he

was -- "I was charged and never received anything.  I also

filled out a slip on 7-15-02 and 7-22-02.              MR.

MERICLI:  I'm going to object to the relevance of this.  I

don't see what relevance it has to the events of May 14th and

what kind of treatment he received.              JUDGE BAXTER:

All right, Mr. Fleming, what is your purpose for having him

read that page?

MR. FLEMING:  I'm laying a foundation that the

medical check -- my initial medical check was never properly

checked beyond the point to see if I needed medication, and I

had -- and I had -- and it took me several weeks later to --

JUDGE BAXTER:  Well, you have this in evidence.

You're arguing to me that his was a faulty evaluation of you

and that another person said something differently?

MR. FLEMING:  That's right.

JUDGE BAXTER:  You have his testimony and you have

this page into evidence already.  So, Mr. Mericli, is right on

this, sustained.  We'll move on.

1          MR. FLEMING:  All right.

2          MR. MERICLI:  If I may --

3          JUDGE BAXTER:  That's an argument you can make.

4      MR. MERICLI:  If I may, I feel it's necessary to

5  interject for the record at this point that I'm a not aware of

6  where he has any medical opinion or record that would indicate

7  that there was anything wrong with Nurse Klos's evaluation.

8          JUDGE BAXTER:  He didn't give it to you?

9  MR. MERICLI:  Not that I've seen.    JUDGE BAXTER:  Okay.

10          MR. FLEMING:  I'm not allowed to comment on that

11  or not?

12          JUDGE BAXTER:  You're saying that document -- in

13  that document that you saw a physician, but Mr. Mericli says

14  it's not in your medical records.

15          MR. MERICLI:  You may have seen a physician, but I

16  don't know of any physician who said --

17          JUDGE BAXTER:  I see.

18          MR. MERICLI:  -- you were injured on May 14th and

19  Mr. Klos did not do a proper evaluation.

20          JUDGE BAXTER:  I see.  All right.

21          MR. FLEMING:  That's the reason why I'm trying to

22  establish a foundation now, on them grounds.          JUDGE

23  BAXTER:  But that doesn't connect up to May 14th is what he's

24  saying.

25          MR. FLEMING:  Well, the complaint -- If you look

1  at what I wrote in the complaint it does.  It clearly says

2  about my wrist and my ankle.

3          JUDGE BAXTER:  But that could have happened any

4  time.  That's July 25th.  So he says you haven't connected

5  that up to May 14th.  That's what he's complaining about,

6  that's his objection.  You understand?

7          MR. FLEMING:  Yeah, I understand.          JUDGE

8  BAXTER:  It's not close in time.

9          MR. FLEMING:  Okay.

10  BY MR. FLEMING:

11      Q.   During your examination, were the cuffs removed?

12      A.   No.

13      Q.   Why not?

14      A.   That's a security issue.  I don't have anything to

15  do with security.  It wasn't necessary to remove your

16  handcuffs or ask them to remove your handcuffs to conduct a

17  medical assessment.

18      Q.   How many guards was present?

19      A.   At least two.

20      Q.   So one guard was with the camera and one guard on

21  security?

22      A.   I don't know how many were present per se, but at

23  a minimum I always have two guards with me at all times.

24          MR. FLEMING:  No further questions.          JUDGE

25  BAXTER:  Cross-examination?

1

2     CROSS-EXAMINATION

3     BY MR. MERICLI:

4

5          Q.     I'd simply like you to take a quick look at these

6     progress notes and tell me if you recognize them as yours?

7          A.     The top note on -- I can't read, the paper in the

8     corner, sir.

9          Q.     I'm trying to get it in line.

10         A.     I'd like to look at it close up, my vision isn't

11    that good.   The top portion is my writing.

12         Q.     Is this easier to read (indicating)?

13         A.     Yes, sir.

14         Q.     Can you read it there at this point or would you

15    like me to hand you the actual document?

16         A.     No, that's okay I think I can read it, sir.

17         Q.     Let me see if I can get it -- That takes it -- Is

18    that good enough?

19         A.     You can down one size if you can.   Two sizes.

20         Q.     Two sizes?

21         A.     Okay, that's fine.

22         Q.     Okay, great.

23         A.     I quote a subjective response.   The quote is -- on

24    the subjective response is, "The guard --"  "The guards hurt

25    my waist --"  "Hurt my wrist and ankle taking me to the

1   library."  Quote.  Complained of right wrist -- Excuse me

2   complained of right wrist quote, slammed through the wicker,

3   unquote.  Complained of the guard, quote, tripped me, period.

4

5       Objective vital signs were, respirations were 16, pulse

6   76, blood pressure 124 over 88 radially.  Complained of --

7   Excuse me, I'm sorry, I can't read my own writing there.  I'm

8   sorry, complained of injury to right wrist and right ankle.

9   Right ankle with no deformity.  Skin integrity intact.

10  Positive pedle pulse.  Positive capillary reflex -- I'm

11  referring to the, I believe the right ankle.

12      No swelling, no redness noted.  Wiggles toes.  Plantar

13  and dorsiflexion right ankle moderately -- Right ankle

14  moderately what?  I can't read that per se from this thing.

15              MR. FLEMING:  Tender.

16  A.     Appears to be reddened.  Complains of right -- at

17  the right ankle at the lateral aspect.  Right wrist complained

18  of pain at lateral aspect of right wrist.  Complained of a

19  constant, sharp pain, quote throbbing.  Right wrist had no

20  deformity.  Skin integrity intact.

21  Q.     Warm and dry maybe?

22  A.     Yes, it is, warm and dry.  Flexes fingers well.

23  Positive radial pulse.  No swelling or reddness noted at site.

24  No distress noted overall.  Assessment, alternation comfort,

25  potential for.

119

1    Q.    What does that mean?

2    A.    Usually -- It's a nursing diagnosis, if there's --

3    If you find some type of problem, you give it a nursing

4    diagnosis, et cetera.  He was potentially -- I didn't see

5    anything -- He had a subjective response of that he was in

6    pain.  I didn't note any type of objective findings to support

7    that finding -- to support that subjective response by the

8    patient.

9    And I just put potential for alteration.  And comfort

10   -- His comfort level there's a alteration for it based on a

11   subjective response.

12   Q.    I understand.  Please continue.

13   A.    No treatment noted.  No injuries noted.

14   Verbalized understanding of placing sick line slip for further

15   evaluation.

16   At that point he was assessed there was no type of

17   treatment that I could perform.  He needed a further

18   examination by the physician assistant and/or the physician.

19   Q.    Okay.  Now one last thing, we were never able to

20   meet before your testimony here today?

21   A.    Right, sir.

22   Q.    And you've never had an occasion before you looked

23   at these things today to look at them again since you prepared

24   them?

25   A.    Yes, sir, I haven't -- I haven't seen that since

1    2002.

2              MR. MERICLI:  Thank you very much.              JUDGE

3    BAXTER:  Anything else, Mr. Fleming?              MR. FLEMING:

4    Yeah, just a few questions real quick.

5

6     REDIRECT EXAMINATION

7    BY MR. FLEMING:

8

9         Q.    You said -- You said the right wrist -- What did

10   you say the right wrist showed?

11        A.    I didn't find any injuries associated with your

12   right wrist.

13        Q.    And you said the right ankle was tender --

14             MR. MERICLI:  If you could wait a second, I could

15   put this back on so he has a chance to have it in front of

16   him.

17        A.    If it --

18        Q.    Could you read that part again, please?

19        A.    Yes, sir.

20        Q.    About the right ankle?

21        A.    It would -- Excuse me, it would be easier if I

22   could just look at the notes.

23        Q.    I can't read it myself.  I tried to read it.  I

24   can't read it.

25        A.    The last aspect of the notes I can't read.

1    MR. MERICLI:  May I approach the witness, your Honor?

2              JUDGE BAXTER:  Yes, you may.

3              THE WITNESS:  Thank you.

4        Q.    Something about the right ankle mildly -- You said

5    mildly something?

6              JUDGE BAXTER:  Moderately red I think?

7        A.    I believe so.  Right ankle moderately red.

8        Q.    Okay, you can stop there.

9        A.    Yes, sir.

10       Q.    Moderately red.  And you said you further did

11   evaluation to the PA, to the physician --

12       A.    To the physician assistant and/or to the

13   physician, based upon your placing a sick line slip in.

14       Q.    So did you see my ankle was mildly red?

15       A.    Yes, I did.

16             MR. FLEMING:  All right, no further questions.

17   JUDGE BAXTER:  Anything else, Mr. Mericli?        MR.

18   MERICLI:  No.

19             JUDGE BAXTER:  You're finished.  Thank you very

20   much, Mr. Klos, you can step down.

21       All right, next witness, Mr. Fleming.

22             MR. FLEMING:  I'd like to call PA -- You have to

23   spell his name, T-E-L-E-G-A.

24

25        D A N I E L   T E L E G A , first having been duly

122

1    sworn, testified as follows:

2

3              CLERK:  Would you please state your full name and

4    spell your last name for the record.

5              THE WITNESS:  Daniel S. Telega, T-E-L-E-G-A.

6

7     DIRECT EXAMINATION

8    BY MR. FLEMING:

9

10        Q.    Thank you.  How are you employed?

11        A.    I'm a physician assistant contracted to the

12   Department of Corrections by Prison Health Services.

13        Q.    How long have you been involved in that?

14        A.    Nine years.

15        Q.    Okay, I'm going to direct your attention to

16   5-15-02, can you recall what you did with the plaintiff on

17   that day, your contact?

18        A.    Yes, I did a medical evaluation.

19        Q.    Can you describe what it entailed?

20        A.    It was an examination of the right wrist and right

21   ankle.  No findings were noted.

22        Q.    So you didn't see mildly red ankle or wrist?

23        A.    No significant findings.

24        Q.    As stated?

25        A.    No.

1    Q.    Did you prescribe anything?

2    A.    I do believe I recommended Advil or Tylenol as per

3    the nursing protocol.

4    Q.    What was it that made you come to the conclusion

5    to prescribe this medication?

6    A.    It's a protocol that if any inmate has a headache

7    or any type of pain, they can request Advil or Tylenol from

8    the nursing staff during the medication rounds.

9    Q.    What kind of pain?

10    A.    Advil or Tylenol.

11    Q.    No, I said --

12    A.    What kind?  Any aches or pains that an inmate may

13    have including headaches, body aches.  All they have to do is

14    request it.  It's not an actual prescription.

15    Q.    So this was -- this is what you felt was necessary

16    for this purpose?

17    JUDGE BAXTER:  The question is, you felt that

18    Tylenol or Advil was necessary for you?

19    MR. FLEMING:  For my injuries, yes.          JUDGE

20    BAXTER:  That's the question.

21    A.    If there was any problem, it could have been

22    requested.

23    Q.    You did a request -- Did you get a request from

24    me?

25    A.    I do believe so.

1    Q.    And can you state what the request said?

2    A.    I cannot recall the exact wording on the request

3    at this time.

4    Q.    Well, can you describe what your initial contact

5    was with me for?

6    A.    It was for right ankle and right wrist pain due to

7    an alleged assault.

8    Q.    Okay, thank you.  5-16-02 I'd like to direct you

9    to your contact with me on that day.

10    MR. FLEMING:  Can I refresh his memory like on

11    certain -- like on the days that I'm describing because it's

12    been awhile?

13    JUDGE BAXTER:  Yes, and you can lead him in that

14    regard, but you can also show him any documents that will help

15    him refresh his memory as well.

16    MR. FLEMING:  All right.

17    BY MR. FLEMING:

18    Q.    5-16-02 -- Was the 5-15 exam videotaped?

19    A.    I cannot recall.

20    Q.    So you don't -- you can't recall if it was

21    videotaped?

22    MR. MERICLI:  It's been asked and answered.

23    JUDGE BAXTER:  He just said no.

24    Q.    5-16-02, I show you --

25    MR. FLEMING:  Can I approach the witness, your

1    Honor?

2             JUDGE BAXTER:  Yes, you may.

3             MR. FLEMING:  Thank you.

4        Q.   I'd like to show you -- You can check it out if

5    you want, 5-16-02, these are your assessments from an initial

6    --

7             JUDGE BAXTER:  Do you have a question for the

8    witness?

9             MR. FLEMING:  Me?

10            JUDGE BAXTER:  Are you asking him to read it and

11   comment on that?

12            MR. FLEMING:  What I'm -- First, I'm refreshing

13   his memory on it.

14            JUDGE BAXTER:  All right.

15            MR. FLEMING:  Then I'm going to comment on it.

16          JUDGE BAXTER:  Ask him a question.

17            MR. FLEMING:  All right.

18            JUDGE BAXTER:  I don't want you to comment, I want

19   you to ask him a question.

20            MR. FLEMING:  All right.

21       Q.   On 5-16-02, was that videotaped?

22       A.   I cannot recall.

23       Q.   Do you recall -- Can you explain the details of

24   what occurred on 5-16-02?

25       A.   I do believe it was a request for further

1    evaluation despite negative exam findings, x-ray consultations

2    were written.

3            Q.    So can you explain where this occurred at?

4            A.    In the RHU.

5            Q.    No, the x-ray?

6            A.    In the medical department of SCI Albion.

7            Q.    And you don't recall no video -- no video of this

8    --

9            MR. MERICLI:  Objection, asked and answered

10    several times.

11            JUDGE BAXTER:  Sustained.  Move on.

12            MR. FLEMING:  All right

13    BY MR. FLEMING:

14            Q.    What did you do?

15            A.    I ordered the x-rays and I reviewed the radiologic

16    reports, as well as viewed the x-rays themselves.

17            Q.    Is the report written?

18            A.    Yes, there is.

19            Q.    What did the report say?

20            A.    No significant findings.

21            Q.    Okay.  I'd like to ask you a few questions -- a

22    few more questions then I'm done.

23            JUDGE BAXTER:  All right.

24            Q.    What does a x-ray check for?

25            A.    Fractures, dislocations, any type of bone

1    abnormality.  It does show some soft tissues as well.

2            Q.    What does a MRI check for?

3            A.    It's more specific for ligament, muscle, and

4    associated soft tissue injuries.

5            MR. FLEMING:  No further questions.        JUDGE

6    BAXTER:  Mr. Mericli?

7

8     CROSS-EXAMINATION

9    BY MR. MERICLI:

10

11           Q.    Did you see anything to indicate that an MRI

12   should be administered?

13           A.    No.

14           Q.    I'm going to ask you if you could just briefly

15   read your physician's assistant notes from your medical

16   examination, which I've marked here (indicating).  Would you

17   rather have them with you or can you read them from this?

18           A.    I can read them.

19           Q.    Okay.  Let me just get the day here for you.

20   Okay, I think that's the entire page.  Is it legible to you?

21   Can you read it?

22           A.    Yes, sir.

23           Q.    Okay, would you please read those signed entries

24   that are by you in your professional capacity?

25           A.    On 5-15-02 there is a partial progress note

128

1    starting with the assessment, right ankle sprain/strain mild.

2    Status, post contusion, right wrist.  Exam essentially within

3    normal limits.  Subjective complaint inconsistent with

4    physical findings.  Plan, in light of minimal findings will

5    check x-ray right ankle and right wrist.  Advised meds

6    Advil/Tylenol, four times a day as needed for pain per nursing

7    protocol.  Return to clinic PRN as needed.  Patient voiced

8    understanding.

9        Q.    Will you proceed to the next entry that's yours?

10       A.    5-17-02, subjective complaint, still complaint of

11   right wrist and right ankle pain.  No help with Advil/Tylenol

12   per nursing staff.  Objective findings as per 5-15-02 exam,

13   reflexes, range of motion right wrist and ankle, no soft

14   tissue/ecchymosis, which is bruising, slash bony abnormality

15   noted.  Right wrist and ankle tender.  Dorsal distal at left

16   forearm.  That's the top end of the right -- the right forearm

17   and interior to the lateral malleolus of the right ankle or

18   inferior to the lateral malleolus.  Right ankle no

19   instability, no antalgia, which is abnormal gait.  Circulatory

20   motor function was intact.      Assessment, alleged assault.

21   Mild right ankle sprain/strain, right wrist contusion.

22   Suspect malingering.  Subjective complaint inconsistent with

23   physical exam.  Plan, in light of minimal findings continue

24   x-ray per -- x-rays per previous orders.  Recommend Motrin 800

25   by mouth three times a day with food as needed for 14 days,

1    return to clinic as needed.

2    Patient invoiced understanding.

3         5-21-02, subjective complaint, as above.  Objective

4    findings as above.  X-rays of right ankle and right wrist

5    reviewed, no acute fractures noted/within normal limits.

6    Assessment, malingering.  Plan, continued per previous orders.

7              MR. MERICLI:  Thank you, I have no further

8    questions.

9              JUDGE BAXTER:  Mr. Fleming, on this do you have

10   any questions?

11             MR. FLEMING:  Yes.

12             JUDGE BAXTER:  All right.

13             MR. FLEMING:  Can I approach the witness?

14   JUDGE BAXTER:  Yes.  Do you have something to show him?

15             MR. FLEMING:  Yeah.

16             JUDGE BAXTER:  All right.

17             MR. FLEMING:  My exhibit.

18

19    REDIRECT EXAMINATION

20   BY MR. FLEMING:

21

22        Q.   You can look at it (indicating), and tell -- would

23   you tell the Court what that is?

24        A.   The top is a -- slip for inmate Fleming for a sick

25   call request of $2 and prescription of $2 dollars for a total

1    of $4.  It was signed by you.  The official approval was our

2    nursing supervisor.  They charge the charge of $4 that was

3    entered July 25th, '02.

4         Q.    And on the next one you can just read the name of

5    the staff who made it official?

6         A.    Dr. -- Dr. Baker our medical director, commented

7    on the sick call request, and it was sent back to you.

8         Q.    And what's the date on it?

9         A.    The date of his signature was July 26th, 2002.

10             MR. FLEMING:  Okay, no further questions.

11   JUDGE BAXTER:  Mr. Mericli?

12             MR. MERICLI:  Nothing.

13             JUDGE BAXTER:  Thank you, you may step down.

14        THE WITNESS:  Thank you, your Honor.

15             MR. FLEMING:  Thank you.  I'm going to move onto

16   the defendants of Camp Hill now.

17             JUDGE BAXTER:  All right.

18             MR. FLEMING:  All right, first I'd like to call

19   Sergeant Kreider.

20

21        R O B E R T   K R E I D E R, first having been duly

22   sworn, testified as follows:

23

24             CLERK:  Would you please state your full name and

25   spell your last name for the record.

1        THE WITNESS:  Lieutenant Robert Kreider.  Last

2   name, K-R-E-I-D-E-R.

3

4    DIRECT EXAMINATION

5   BY MR. FLEMING:

6

7        Q.    How are you employed?

8        A.    I'm a lieutenant for the department of corrections

9   at Camp Hill.

10       Q.    How long have you been a Lieutenant?

11       A.    About seven months.

12       Q.    How long have you been involved in corrections?

13       A.    Thirteen years.

14       Q.    I want to direct your attention to -- I need my

15   documents -- Excuse me for a minute.

16            JUDGE BAXTER:  You can have a minute.  Is there

17   something up here you're looking for?

18            MR. FLEMING:  Yeah.  Can I approach the witness?

19            JUDGE BAXTER:  You may.  What do you have?

20   MR. FLEMING:  I need Exhibit 8.

21            JUDGE BAXTER:  Here (indicating).

22       Q.    I'd like to direct your attention to August 12th,

23   that's when the slip -- August 11th -- of August 11th, I'd

24   like to --

25            JUDGE BAXTER:  2002.

1    Q.    2002, August 11th of -- What did I say?  August

2    2nd of 2002 with the -- Can I see that, please?

3    A.    Yeah.

4    Q.    Excuse me here for a minute.  I'm like rambling

5    right now.

6         Okay, I'd like to direct your attention to August 2nd

7    of 2003.  My fault, sorry, 2003, of the assault of another

8    inmate next door to my cell, which I filled out a affidavit

9    for this inmate.

10        JUDGE BAXTER:  I'm sure there's a question in

11   there somewhere, Mr. Fleming.  Let's get to it.

12   Q.    Were you aware that I informed staff through -- of

13   a alleged incident that occurred on August 2nd?

14   A.    What incident?

15   Q.    Of a assault on another inmate.

16        MR. MERICLI:  I object to the form of the

17   question.  I don't think it's clear what --

18        JUDGE BAXTER:  I'm not sure what he's asking

19   either.  The document you showed him is a cover sheet and

20   inmate request to staff member.

21        MR. FLEMING:  Right.

22        JUDGE BAXTER:  Dated 8-12-03.  What's the

23   question?

24   Q.    Are you aware of this request?  Let me make a long

25   story short.  You can check it out for yourself first.  Then

1      --

2                 JUDGE BAXTER:  Then the --

3      A.    No.

4                 JUDGE BAXTER:  Then to the question on the floor,

5      he says, no.

6                 MR. FLEMING:  That's what I was trying to get at,

7      excuse me.

8                 JUDGE BAXTER:  Okay.

9      Q.    So you're not aware of that, okay.

10                 MR. FLEMING:  Can I hold this for a minute, your

11     Honor?

12                 JUDGE BAXTER:  It's your exhibit, absolutely.

13          MR. FLEMING:  All right.

14                 JUDGE BAXTER:  You can't change it in any way,

15     it's part of the evidence.

16     Q.    You stated you're not aware of that?

17     A.    No, I'm not aware of the request

18                 JUDGE BAXTER:  That's three times you've asked

19     him.

20     Q.    Did you read it?

21     A.    When you had it laying up here?

22     Q.    Yes.

23     A.    No.

24     Q.    Can you read it to the Court?

25     A.    You want me to read it to the Court?

1    Q.    Yeah.

2    A.    Okay.    This request --

3         MR. MERICLI:  I object because I don't believe it

4    has -- it is his writing.

5         THE WITNESS:  It's not made out to me.

6         MR. MERICLI:  Just anyone can read it and --

7    JUDGE BAXTER:  Where are you going with this, because

8    it's already part of the record?  I'm going to look at that

9    anyway.

10        MR. FLEMING:  I'm laying the foundation so that I

11   can establish my direct examination in the order that I had --

12        JUDGE BAXTER:  That you want to go?

13        MR. FLEMING:  Right.

14        JUDGE BAXTER:  But -- Mr. Mericli, is it

15   relevance?  Is it hearsay?

16        MR. MERICLI:  He's attempting to impeach a witness

17   -- What I think he's trying to do is to cross-examine him

18   about --

19        JUDGE BAXTER:  I don't have a clue.  What do you

20   think he's doing?

21        MR. MERICLI:  I think he's trying to get him

22   coming and going.  He's trying to impeach him.         JUDGE

23   BAXTER:  On this?

24        MR. MERICLI:  On a statement that was written by

25   somebody else.

1          JUDGE BAXTER:  Are you trying to impeach him?

2      MR. FLEMING:  No.

3          JUDGE BAXTER:  He's trying to lay a foundation he

4  says.

5          MR. FLEMING:  I'm trying to get --

6          JUDGE BAXTER:  Why don't you lead, this is what

7  happened on August 2nd, are you aware of that?  If he's not,

8  well then say, this is what happened and then go to your

9  question.

10          MR. MERICLI:  He said he's never seen the

11  document, your Honor.

12          JUDGE BAXTER:  He's never seen this document, he

13  doesn't know anything about this incident, and the problem

14  with all of that is if you want that incident to come into the

15  record, it's already in the record by that document.  But you

16  can't bring it in by someone who doesn't know anything about

17  it.

18          MR. FLEMING:  Right, that's what I --          JUDGE

19  BAXTER:  You can't make him know something about it by having

20  him read that document.  It's not refreshing a recollection if

21  he has no recollection.          MR. FLEMING:  He already said

22  no.  I just wanted to make sure that he understood what he was

23  saying no to.          JUDGE BAXTER:  I see.  You read it and

24  you still -- now this is the last time -- have no recollection

25  of that incident?

136

1          THE WITNESS:  I have no recollection of that.

2          JUDGE BAXTER:  All right.

3          THE WITNESS:  To me.

4          JUDGE BAXTER:  All right, moving along.

5          MR. FLEMING:  Okay, now I'll get the ball rolling.

6     I need Exhibit 7.

7          JUDGE BAXTER:  Seven (indicating).

8          MR. FLEMING:  Can I approach the witness, please?

9          JUDGE BAXTER:  To show him Exhibit 7, yes, you

10    may.

11    BY MR. FLEMING:

12         Q.    Are you aware of that?

13         A.    The incident, yes.

14         Q.    All right.  Now I'd like to direct your attention

15    to this incident and this misconduct.  Can you explain what

16    happened?

17         A.    You received a misconduct from Officer Wittel.

18         Q.    Can you give some details for what to the Court

19    please?

20         A.    We were running yard, I was outside the block,

21    Officer Allen and Officer Wittel were bringing in another

22    inmate, I have no idea who, out to the yard.  At that time,

23    someone was banging on the window.  I directed Officer Wittel

24    to go in and find out who it was.  The inmate, whoever it was

25    at that time, because he was not identified, continued to bang

1  on the window.  Officer Wittel went in and identified you

2  banging on your window.

3       Q.    How far away were you from this window?

4       A.    About from here to the flat screen over there

5  (indicating).

6       Q.    Can you explain to the Court exactly how wide

7  these windows are?

8            JUDGE BAXTER:  What are the size of the windows?

9       A.    Maybe a foot wide and --

10      Q.    Can you -- Like this big (indicating)?

11 JUDGE BAXTER:  It's better to have a foot wide.  You can't put

12 this big on the court reporter's transcript.  A foot wide and

13 how tall?

14           THE WITNESS:  Maybe two foot.

15           JUDGE BAXTER:  Okay.

16           THE WITNESS:  High.

17 BY MR. FLEMING:

18      Q.    So you said you were how far from the window?

19      A.    From here to the screen over there, the flat --

20 biggest flat screen in the courtroom.

21      Q.    And you seen somebody banging on a window?

22      A.    No, I said I heard.

23      Q.    You said you heard.  If you heard it you didn't

24 see it though?

25      A.    If I sent an officer inside a cell block because I

1    heard someone banging on a window and that officer identifies

2    you, that means I'm a witness.

3         Q.    Okay.  Now who was this officer?

4         A.    I already answered that question once, it was

5    Officer Wittel.

6         Q.    Okay.  Here it states there was somebody else

7    there, too?

8         A.    Officer Allen.

9         Q.    Did you send him, too?

10        A.    To my recollection, no.  But he did hear the

11   banging.  I don't know for sure because Officer Wittel and

12   Officer Allen escorted an inmate out to the yard and I

13   addressed Officer Wittel in Officer Allen's presence.

14        Q.    So how did you find out it was the plaintiff?

15        A.    Officer Wittel walked inside the block and clearly

16   identified you.

17        Q.    And came back.  And what happened when he did

18   that?  What did he do?

19        A.    He came back and reported to me who it was.

20        Q.    And you signed on this misconduct as a witness

21   with no evidence --

22               MR. MERICLI:  Objection to the form of the

23   question.

24               JUDGE BAXTER:  You're assuming facts that --

25   You're actually making a determination.

1           MR. FLEMING:  All right.

2           JUDGE BAXTER:  What you have -- You have to ask

3     the question so that it's not --

4           MR. FLEMING:  Leading.

5           JUDGE BAXTER:  Well, I'm going to allow you to

6     lead.  Ask the question.  Objection overruled.  Let's try

7     again, ask the question again.

8           MR. FLEMING:  All right.

9     BY MR. FLEMING:

10          Q.    You said that Officer Wittel came back and told

11    you who it was?

12          A.    Yes.

13          Q.    And you signed as a witness based on what he told

14    you?

15          A.    No, I signed as a witness -- Which I didn't sign,

16    he put my name there.  I was a witness because I heard the

17    banging of the window.

18          Q.    Wait a minute.  Let me read that, redirect -- Let

19    me redirect back to, you mean he forged your name on this

20    misconduct?

21          A.    No.

22          Q.    Did you sign it?

23          A.    I believe my name is printed on that misconduct,

24    not signed.

25          Q.    Did you print your name on this misconduct?

1    A.    No.

2        MR. FLEMING:  Don't have no further -- I'll move

3    on to his affidavit.  I need my -- I need --

4        MR. MERICLI:  It's Exhibit 6, sworn affidavit, is

5    that what you need?

6        MR. FLEMING:  Yeah.

7        MR. MERICLI:  Why don't you put it on that thing

8    right there and he can read it and everyone else can read it.

9    Q.    Sergeant Kreider can you see this exhibit here

10    (indicating)?

11    A.    I can see, yes.

12    Q.    All right, you may read it to let you see --

13        JUDGE BAXTER:  Do you want to give him a few minutes to

14    read it?  It's long.

15    Q.    You don't got to read the whole thing, just see

16    what it entails.

17    A.    What question do you want to ask me?

18    Q.    What I'm asking you is did you read that?

19    A.    I've read over it, yes.

20    Q.    All right, so you pretty much can get a foundation

21    what's in it?

22    A.    You wrote a sworn affidavit.

23    Q.    Do you remember --

24    A.    It involved Lieutenant Leggore at the time,

25    myself, Officer Wittel and Officer Allen.

1    Q.    You remember seeing it?

2    A.    I see it now, yes.

3    Q.    I mean beyond this point?

4          JUDGE BAXTER:  Have you seen this before?

5          THE WITNESS:  I think that I got a copy -- There

6    was a suit I believe with inmate Colbert that never went

7    anywhere, I think I got a copy of this with that, but I can't

8    recall.

9    Q.    Okay.

10   A.    But I think it was in at least 2003, I think.

11   Q.    Thank you.  So you did see this before then?

12   A.    When I received a copy --

13         JUDGE BAXTER:  You're asking the same question

14   always in repeat.  That's a part of why it's taking so long.

15   After he makes the answer, ask him the next question, don't

16   say, so you just did.  I'm getting testy.

17         MR. FLEMING:  I don't have no further questions

18   for this witness, your Honor.

19         JUDGE BAXTER:  Excellent.  Mr. Mericli?

20   MR. FLEMING:  I'll move on.

21

22    CROSS-EXAMINATION

23   BY MR. MERICLI:

24

25   Q.    Where was Mr. Fleming's assignment -- Where was

Mr. Fleming's housing assignment at SCI Camp Hill?

A.    He would have been on the "D" pod, and the best of my knowledge he was probably in cell three or four.

Q.    What type of confinement was he in?  Was he in general population --

A.    He was in our special management unit.

Q.    What is the special management unit, just briefly?

A.    It's a unit above an RHU setting, a restricted, housing setting.  There's basically five phases to it.  Phase one being that they're back out into general population.  Phase five is they have DC time when they first come in to an SMU setting.  Usually they have disciplinary custody times.  They have to -- On their behavior time, the longer they're in without misconducts they get some of their DC time taken or set aside.

It's a program to help inmates who are behavioral problems and assaultive to staff and things like that, get back out into general population, okay.

Q.    So, would you think it's fair to say it's a special rehabilitation program for particularly incorrigible inmates?

A.    Yes, it's a very structured special setting, everything is done on behavior.

Q.    Now did you have any knowledge that Mr. Fleming had filed suit against people at SCI -- at SCI Albion?

1      A.    No.

2      Q.    Would you have taken an interest in something like

3  that?

4      A.    No.

5      Q.    We were talking a little bit earlier today, you

6  mentioned earlier -- you mentioned something about the nature

7  of remarks that prisoners in the SMU made to you about filing

8  suit --

9      A.    That happens on --

10      Q.    Would you share that with the Court, please?

11      MR. FLEMING:  I object.

12          JUDGE BAXTER:  On what basis?

13          MR. MERICLI:  It's just --

14          JUDGE BAXTER:  Hold on.

15          MR. FLEMING:  Relevance.

16          MR. MERICLI:  Just -- This is relevant to show --

17  This is a retaliatory conduct case, it's relevant to show he

18  lived and worked in the SMU and in an ambience of constant

19  reference to the possibility of suit, threats of suits --

20          JUDGE BAXTER:  The objection is overruled.  You can

21  answer the question.

22          THE WITNESS:  Would you please repeat your

23  question again?

24  BY MR. MERICLI:

25      Q.    What type of atmosphere was there in terms of

1    relations between inmates and corrections officers in the SMU

2    and discussions of lawsuits by the inmates in the SMU?

3        A.    Working in the SMU setting where inmates are in

4    there for behavioral problems, outside the normal operations

5    of an institution, it's not uncommon every day for an inmate

6    or two to -- as soon as you tell them something they don't

7    want to hear, to tell you they got after lawsuit against you

8    or something like that or alleged abuse.  It's not uncommon.

9    I would say it happens every day.

10        Q.    Well, what type of a reaction did you -- And to

11    the extent you might be able to comment on it, your colleagues

12    had as a result of that exposure to that type of

13    recrimination?

14        A.    My personal thing is I could careless what they

15    say when it -- because it happens every day, you just grow

16    accustomed to it.

17        Q.    You become desensitized?

18        A.    Correct.

19        Q.    Do you remember how many times, including -- Well,

20    let me make this clear.  You did not write this particular

21    misconduct, correct?

22        A.    Correct.

23        Q.    Do you remember how many misconducts you wrote

24    against Mr. Fleming while he was in SMU?

25        A.    Two to the best of my knowledge.

1     Q.     Could you comment on whether that's a large amount

2   or a small amount for a prisoner in that custody status?

3          MR. FLEMING:  Objection.

4     A.     That's a small action.

5          JUDGE BAXTER:  Whoa, there's an objection.

6          MR. FLEMING:  It was more than two.                    JUDGE

7   BAXTER:  Well, no, that's his answer.  You can't change his

8   answer.

9          MR. FLEMING:  All right.

10          JUDGE BAXTER:  You can't change his answer.

11     MR. FLEMING:  My fault, sorry.

12   BY MR. MERICLI:

13     Q.     How many?

14          JUDGE BAXTER:  His objection is withdrawn.

15     A.     Two.

16     Q.     Do you have any idea in view of the fact you were

17   sergeant at that time how many Officer Wittel would have

18   written against him?

19     A.     The information that we gathered from the DOC

20   internet when we come up here was I issued two misconducts, to

21   inmate Fleming, Officer Wittel wrote one misconduct, and

22   Officer Allen wrote one misconduct.

23     Q.     Could you comment for the understanding of the

24   Court on what that means in terms of your relationship to him

25   as an inmate in SMU?

146

A.    That's telling me that we don't give him any more
attention than we gave any other inmate.

Q.    Do you recall an incident involving inmate
Colbert?

A.    Yes.

Q.    What happened during that incident?

A.    Myself, Lieutenant Leggore, Officer Allen, Officer
Wittel were going -- were conducting a cell search.  Inmate --
Excuse me, inmate Colbert was outside his cell.  I believe
Officer Wittel was searching the cell, but it's been a couple
years, I apologize.

Inmate Colbert continued to argue with Officer Allen.
He was holding him outside the cell cuffed.  The lieutenant
told him, told inmate Colbert to stand there and be quiet,
because he continued to try to turn around when he was suppose
to be standing facing forward.  He instructed inmate Colbert
-- the lieutenant did -- he instructed inmate Colbert that the
next time he spoke out or tried to turn around he would be
held against a wall until his cell search was complete.

He no sooner had got the words out of his mouth and
Colbert tried to turn around again.  At that time I gave
direction as the sergeant to place inmate Colbert against the
wall and hold him in place until his cell search was complete.

Q.    Am I right that this happened on August 2nd, 2003?

A.    If you have the documentation there in front of

1    you, yes.  Other than that, I don't recall.

2          Q.    You do recall, however, from what's been shown

3    that Officer Wittel's conduct against Mr. Fleming was August

4    11th, 2003?

5          A.    Yes, sir.

6          Q.    Are you confident then that this incident with

7    Colbert occurred before the incident with Fleming?

8          A.    Yes, it did.

9          Q.    Did you have any reason to think Fleming had

10   anything to do with the incident with Colbert?

11         A.    No.

12         Q.    Was Fleming present in the sense of being out of

13   his cell?

14         A.    No.

15         Q.    So he wasn't physically or personally involved in

16   anyway with Colbert?

17         A.    No.

18         Q.    Now he's shown you this affidavit but he hasn't

19   shown you the date on this.  Will you take a look at the date

20   on it now (indicating)?

21         A.    August 2nd, 2000.

22         Q.    And I'm correct that this --

23         A.    I -- I think it's 2000 or 2000 --

24         Q.    2003?

25         A.    Okay, August 2nd, 2003.

148

1      Q.    Can you see the signatures at the bottom, Ronald

2  Fleming and Tyrone Colbert?

3      A.    Yes, sir.

4      Q.    You were shown this before by Mr. Fleming on

5  direct.  And this is a sworn affidavit that has to do with

6  their take on the Colbert incident you just described, right?

7      A.    Yes, sir.

8      Q.    Did you see this at any time on or before August

9  11th, 2003 when you heard the banging on the window?

10     A.    No.

11     Q.    Did you have any idea on August 11th that it

12  existed?

13     A.    No.

14          MR. MERICLI:  No further questions.  Thank you,

15  sir.

16

17   REDIRECT EXAMINATION

18  BY MR. FLEMING:

19

20     Q.    Do you see that date on there (indicating), sir?

21     A.    Yes.

22     Q.    Can you tell the Court what that date says?

23     MR. MERICLI:  Asked and answered.

24          MR. FLEMING:  Okay.  Okay, never mind.

25  JUDGE BAXTER:  Sustained.

1          MR. FLEMING:  May I approach the witness?

2     JUDGE BAXTER:  To show him that affidavit?        MR.

3     FLEMING:  Yes.

4          JUDGE BAXTER:  Yes, go ahead.

5     BY MR. FLEMING:

6          Q.   Are you familiar with this document?        JUDGE

7     BAXTER:  Something different?  What is it you're showing him?

8          MR. FLEMING:  His affidavit.

9          JUDGE BAXTER:  His affidavit?

10          MR. FLEMING:  His interrogatory with the affidavit

11    on it.

12          JUDGE BAXTER:  That would be Defendant's Exhibit

13    "G"?

14          MR. MERICLI:  I believe so, your Honor.

15          THE WITNESS:  Yes.

16    BY MR. FLEMING:

17          Q.   Okay, I'd like for you to tell the Court the date

18    on that?

19          A.   September 29th, 2004.

20          Q.   Is it before or after the document that you're

21    looking at now?

22          A.   After.

23          Q.   Thank you.  Can you read number seven, please?

24    This (indicating).

25          A.   I can't really read it clearly.

1        MR. FLEMING:  Your Honor, can I read it in front

2    of his attorney so he can see that I ain't changing nothing

3    up?

4        JUDGE BAXTER:  He has a copy.  You can read what

5    you want to read and then ask your question.

6        MR. FLEMING:  All right.

7    Q.    I ask you, were you aware that on August 2nd, 2003

8    that the plaintiff filled out a sworn affidavit for Tyrone

9    Colbert with your name -- with your name on it?  And you said,

10   no.

11       MR. MERICLI:  I'm going to object and move to

12   strike, this is irrelevant.  He said -- It's not inconsistent

13   with anything he's testified to.        JUDGE BAXTER:

14   Actually it supports it.

15       MR. FLEMING:  I'd like to move that in evidence --

16   It's already in.

17       JUDGE BAXTER:  The objection is overruled.  It's

18   fine.  He testified to that, and this is in evidence.

19   MR. FLEMING:  No further questions.        JUDGE BAXTER:

20   Anything else, Mr. Mericli?

21       MR. MERICLI:  No, your Honor.

22       JUDGE BAXTER:  All right, you may step down.

23   Lieutenant Kreider, thank you.

24       We're going to take a -- We've been here an hour.

25   Let's take a 15 minute break to 3:30.  Then I'm going to go to

1    4:30 and then I'm going to have to stop court at 4:30.

2           MR. MERICLI:  Very good, your Honor.           JUDGE

3    BAXTER:  All right, 15 minute break.

4               (At which time, 3:15 p.m., a recess was taken and
                 the proceedings resumed at 3:35 p.m.)

5

6           JUDGE BAXTER:  All right, Mr. Fleming.

7           MR. FLEMING:  Yes, I'd like the call CO Allen to

8    the stand.

9

10          P A U L   A L L E N, first having been duly sworn,

11   testified as follows:

12

13          CLERK:  Would you please state your full name and

14   spell your last name for the record?

15          THE WITNESS:  Paul F. Allen, A-L-L-E-N.

16

17   **DIRECT EXAMINATION**

18   BY MR. FLEMING:

19       Q.   How are you employed?

20       A.   Excuse me?

21       Q.   How are you employed?

22       A.   I'm a Corrections Officer, SCI Camp Hill.

23       Q.   Thank you.  How long have you been employed there?

24       A.   About seven and a half years.

25       Q.   I want to direct your attention to August 2nd,

152

1    2002 -- 2003 and August 11th of 2003.  First, I want to show

2    you an exhibit.

3                MR. FLEMING:  If I may approach the bench?

4                JUDGE BAXTER:  You may.

5                MR. FLEMING:  I think I got it right this time.

6        Q.    See if you're familiar with that (indicating)?

7                JUDGE BAXTER:  What exhibit are you showing him for the

8    record?

9                MR. FLEMING:  The request slip.

10               THE WITNESS:  Number eight.

11               JUDGE BAXTER:  Number eight, Plaintiff Exhibit

12   number 8.

13       A.    Okay.

14       Q.    What?

15       A.    Okay.

16       Q.    Are you familiar with it?

17       A.    No.

18       Q.    You don't know anything about affidavit?

19       A.    No, I do not.

20       Q.    I'd like to direct your attention now to August

21   11th, 2003 a incident report that was signed with your name --

22   printed with your name on it as a witness for the plaintiff,

23   me, banging on a window for refusing to obey an order, using

24   abusive, obscene and offensive language to an employee; do you

25   recall that?

153

1          A.   I don't recall the whole situation, no.  If I saw

2     the document --

3               MR. FLEMING:   May I --

4               JUDGE BAXTER:   Excuse me, his answer was, no, I

5     don't recall.  I reviewed the document.  What's your question?

6               MR. FLEMING:   This is Exhibit 7.  I showed him

7     Exhibit 8 which was the request.  Now I'm showing him the

8     misconduct, Exhibit 8.

9               JUDGE BAXTER:   Ask him your next question.  He

10     said he doesn't recall.

11               MR. FLEMING:   May I approach the witness and show

12     him this exhibit?

13               MR. MERICLI:   You may.

14               MR. FLEMING:   All right.

15          A.   I looked at the document, okay.

16          Q.   Are you familiar with it?

17          A.   I am now, yes.

18          Q.   Did you print your name on here as a witness?

19          A.   No, I did not.

20          Q.   Who did it?

21          A.   Officer Wittel.

22          Q.   He wrote the --

23          A.   He would have printed my name.

24          Q.   It's a document on the screen right in front of

25     you.  Would you take a look at that, please and -- Can you

1     read that?

2          A.   Yep.

3          Q.   All right, you can check it out.

4          A.   Okay.

5          Q.   See if you're familiar with that.  That's exhibit

6     --

7               JUDGE BAXTER:  Plaintiff Exhibit 8.

8               MR. FLEMING:  Yes.

9               CLERK:  Is this your sworn affidavit, sir?

10    MR. FLEMING:  Yeah.

11              CLERK:  It's actually Plaintiff Exhibit 6.

12    MR. MERICLI:  He got it from me.  I mismarked them.

13         A.   Okay.

14         Q.   Are you familiar with that?

15         A.   I'm familiar with the events.

16         Q.   Are you familiar with the sworn affidavit?

17         A.   Not until I was served to come to court and I saw

18    it.

19         Q.   Did it have this on it on the bottom when you

20    reviewed it when you had a chance to get to court?

21         A.   Yes, I'm looking at it now.

22         Q.   Thank you, okay.

23              MR. FLEMING:  Your Honor, may I approach the

24    witness?

25              JUDGE BAXTER:  What are you going to show him this

1    time?

2            MR. FLEMING:   Interrogatories and production and

3    sworn affidavit.

4            JUDGE BAXTER:   You may.

5        Q.    Do you see the date on that affidavit?

6        A.    August 2nd, 2003.

7        Q.    All right.   Now I would like to show you, is that

8    your signature and sworn affidavit?

9        A.    Yes, it is.

10       Q.    And the date?

11       A.    29th day of September, 2004.

12       Q.    Is that after the affidavit or before?

13       A.    After.

14       Q.    Thank you.  Thank you.  Just one more question.

15   On number seven in your interrogatories and production you

16   were asked, were you aware that on August 2nd the plaintiff

17   filled out a sworn affidavit for Tyrone Colbert when you

18   first saw it --

19           MR. MERICLI:  I renew my objection, the same

20   objection I have made.

21           JUDGE BAXTER:  It's overruled.  Go ahead and ask

22   your question

23   BY MR. FLEMING:

24       Q.    And you state under oath, no, I was not aware that

25   inmate Fleming filled out an affidavit for any of that.

1        MR. FLEMING:  No further questions.              JUDGE

2   BAXTER:  Mr. Mericli?

3

4    CROSS-EXAMINATION

5   BY MR. MERICLI:

6

7        Q.   Is the SMU -- Well, you heard Lieutenant Krieder's

8   testimony --

9        A.   Yes, sir.

10       Q.   And you heard him discuss about how the SMU is a

11  stepped program?

12       A.   Yes, sir, it's a phased program.

13       Q.   A phased program, thank you.  Do you have any

14  recollection about whether, and if so, how far during his

15  period of time in the SMU at Camp Hill Mr. Fleming progressed

16  through the phases?

17       A.   He progressed all the way down to phase two, which

18  meant he could come out and work on the tier without

19  restraints.

20       Q.   Did this occur after the August 11th, 2003

21  misconduct that Wittel wrote him?

22       A.   I believe it did, yes.

23       MR. MERICLI:  No further questions, thank you.

24   JUDGE BAXTER:  Mr. Fleming?

25

1    REDIRECT EXAMINATION

2

3    BY MR. FLEMING:

4

5         Q.    So would you say that by me coming out my cell in

6    the SMU in this phase without restraints is a good or bad?

7         A.    It's good, it means you progressed through the

8    program without any problems.

9              MR. FLEMING:   No further questions.            JUDGE

10   BAXTER:   You may step down.   Thank you very much.

11             THE WITNESS:   Thank you.

12             MR. FLEMING:   Thank you.

13             JUDGE BAXTER:   Is there anybody left, Mr. Fleming?

14

15             MR. FLEMING:   One more.

16             JUDGE BAXTER:   One more and probably feeling so

17   left out by now.   All right, call your next witness.

18   MR. FLEMING:  I'd like to call CO Wittel.

19             JUDGE BAXTER:   Of course, we haven't seen Mr.

20   Wittel.

21             MR. FLEMING:   Last but not least.

22

23        J E S S I E   W I T T E L, first having been duly  sworn,

24   testified as follows:

25

1          CLERK:  Would you please state your full name and

2    spell your name for the record.

3          THE WITNESS:  Jessie M. Wittel, W-I-T-T-E-L.

4

5    **DIRECT EXAMINATION**

6    BY MR. FLEMING:

7

8          Q.    How are you employed?

9          A.    Corrections Officer at SCI Camp Hill.

10         Q.    Thank you.  How long have you been employed --

11         A.    Almost five years.

12         MR. FLEMING:  Your Honor, may I approach the

13    witness?

14         JUDGE BAXTER:  With?

15         MR. FLEMING:  Exhibit 8.

16         JUDGE BAXTER:  You may.

17    BY MR. FLEMING:

18         Q.    I just want to ask you if you're familiar with the

19    document right here (indicating)?

20         A.    No.

21         Q.    Thank you.  I'd like to direct your attention to

22    August 11th, 2003.  You issued me, the plaintiff, a misconduct

23    for refusing to obey a order, using abusive, obscene or

24    inappropriate language to an employee.  Can you explain that,

25    please?

1    A.    You want me to explain the misconduct --

2    Q.    The --

3    A.    -- Or what?  The events which happened?

4    Q.    Well, it's the same thing.  The misconduct or the

5    events, it would be the same thing.

6          JUDGE BAXTER:  How about you ask him for one now

7    and one next.

8    Q.    Explain your misconduct, what -- what it was

9    issued for?

10   A.    It was issued for refusing to obey an order and

11   using obscene language.

12   Q.    That's what it -- the incident?

13   A.    The incident?

14   Q.    Yes.

15   A.    The incident was me and Officer Allen were

16   escorting an inmate, and Sergeant Kreider was out in the yard.

17   There was banging come from the "D" side -- the "D" side,

18   downstairs.  Sergeant Kreider directed me in the general area

19   to see where that banging was coming from.

20         I went up to your door, clearly saw you sitting on your

21   desk banging on the window, yelling outside.  I gave you three

22   orders to stop, three direct and separate orders to stop the

23   banging.  I believe you cussed me out for a few seconds, and I

24   continued on with my duties.

25   Q.    You says sitting on my bed banging on the window?

1    A.    No, I set said sitting on your desk banging on the

2    window.

3    Q.    Okay.  Okay, you have here on this misconduct two

4    witnesses.  Can you explain why you signed their names instead

5    of them?

6    A.    That is protocol.  If there was a -- If there

7    would have been inmates around there who would have saw it, I

8    would have put inmates down as witnesses.  Did I not sign

9    anybody's name.  I printed names.  Nobody else signed that

10   misconduct, it was just me.

11   Q.    Were they in the immediate area during the

12   incident?

13   A.    They had involvement in the misconduct.

14   Q.    It would have been easier for them to sign it

15   since them being right there?

16   A.    The reason for me putting those witnesses are --

17   are for my credibility in case I would have been called to the

18   hearing examiner when he brought the charges up against you.

19   Q.    Okay.  Were they in the immediate area at the time

20   of the incident?

21   A.    Yes, they were.

22   Q.    Meaning the signatures could have been signed by

23   them?

24   A.    There's no signatures on that besides -- In that

25   area there's no signatures.

1    Q.    All right, I'm moving on before I get -- This is a

2    document in front of you on the screen there?

3    A.    Correct.

4    Q.    I'd like to show this to you, see if you are

5    familiar with this document.  You can go ahead and read it.

6    A.    I've seen it multiple times.

7    Q.    So you --

8    A.    Just today.

9         JUDGE BAXTER:  He's been sitting down there.

10   Q.    I'm talking about beyond you just sitting in this

11   courtroom?

12   A.    It was issued to me when this court case came up,

13   I got one.

14   Q.    That's the only time -- That's the only time you

15   seen it?

16   A.    Yes.

17   Q.    You never seen it before?

18   A.    No.

19   Q.    Can you see this name where my pen is at?

20   A.    Yes.

21   Q.    Did he take a action on you?

22   A.    Excuse me?

23   Q.    Did he take any action on you for this?

24   A.    I don't understand your question.

25   Q.    Did he take any civil action on you?

1    A.    I believe he attempted to.

2    Q.    And you were never made aware of this document as

3    the others were?

4    A.    I still don't understand your question entirely.

5    Q.    Prior to what we're here for now, did you ever see

6    this sworn affidavit?

7    A.    No.

8    Q.    Never?

9    A.    Not that I'm aware of.

10    Q.    So the other officers seen it but you never seen

11    it?

12          MR. MERICLI:  Objection, to the form of the

13    question.  I like to have a foundation --

14          JUDGE BAXTER:  I don't think that was the

15    testimony.  I don't think that was the testimony anyway.  It's

16    very hard to ask a question when you are summarizing former

17    testimony.

18          MR. FLEMING:  All right.

19          JUDGE BAXTER:  We'll be on you to make sure you

20    get it right, that's what he's complaining about.

21          MR. FLEMING:  All right.

22          JUDGE BAXTER:  But he answered the question.  He

23    said he doesn't believe he's seen it before this case.

24    Q.    So you never -- okay.

25          JUDGE BAXTER:  Yeah, you asked that.

163

1     MR. FLEMING:  Is that paper still up there or do I

2  got it?

3     JUDGE BAXTER:  The affidavit is on the machine.

4     MR. FLEMING:  No, I'm talking about the interrogatory.

5  Here we go right here.  Can I approach the witness, your

6  Honor?

7     JUDGE BAXTER:  With that document?

8     MR. FLEMING:  Yes.

9     JUDGE BAXTER:  You may.

10  BY MR. FLEMING:

11     Q.    Are you familiar with that (indicating), the

12  production and interrogatories?

13     JUDGE BAXTER:  Is that his own?

14     MR. FLEMING:  Wittel's.

15     A.    Yes.

16     JUDGE BAXTER:  Okay, I think that's Defendant's

17  Exhibit "I".

18     Q.    Is that your sworn statement on there?

19     A.    That's my signature.

20     Q.    All right, thank you.  Did you state on number

21  seven under oath, that you were never aware of any affidavits

22  -- And this is your statement under oath?

23     A.    I signed that statement.

24     JUDGE BAXTER:  What was the answer?  I'm not

25  looking at it.  Tell me what the answer was to that.

1    MR. FLEMING:  The answer to my question, he said, no.  He

2    said, no.

3              JUDGE BAXTER:  Okay.

4              MR. FLEMING:  Okay, I'm going to move ahead.

5        Q.   And by saying that you're aware that it was an

6    action tooken on you regards to the document in front of you?

7

8              JUDGE BAXTER:  A legal suit -- Are you aware there

9    was a saw lawsuit against you regarding this incident?

10        A.   Yes, I knew there was a lawsuit -- an attempted

11    lawsuit against me.

12              MR. FLEMING:  No further questions.        JUDGE

13    BAXTER:  Mr. Mericli?

14

15     CROSS-EXAMINATION

16    BY MR. MERICLI:

17

18        Q.   Officer Wittel, at the time you wrote the

19    misconduct against Mr. Fleming, were you aware that he had

20    written this affidavit that's on the screen in front of you --

21        A.   No.

22        Q.   -- On behalf of Mr. Colbert?

23        A.   No.

24        Q.   It's fair to say that sometime after that you

25    became aware that that happened?

1    A.    Yes.

2    Q.    But you didn't know about it at that time?

3    A.    No.

4    Q.    When you were asked on your interrogatories if you

5    could just simply refresh your recollection there, you were

6    asked basically if you knew on August 11th about this -- of

7    2003 about this affidavit, right?

8    A.    Correct.

9    Q.    And your answer as always is?

10    A.    No.

11         MR. MERICLI:    Thank you.

12         MR. FLEMING:    All right.

13

14    REDIRECT EXAMINATION

15    BY MR. FLEMING:

16

17    Q.    So you do state that sometime after you did become

18    aware of this affidavit?

19    A.    When I saw --

20         MR. MERICLI:    Objection, relevance.            JUDGE

21    BAXTER:    Well, it's already been asked and answered anyways,

22    so objection overruled.    This is the last time you're asking

23    the question.    Go ahead.

24         MR. FLEMING:    Okay.    I have a different question

25    because --

166

1         JUDGE BAXTER:  All right, go ahead.

2    BY MR. FLEMING:

3         Q.    Did you -- How long after that you became aware?

4         A.    I became aware of that affidavit when I signed for

5    it.

6         Q.    Can you recall when you signed for it?  Speaking

7    of the --

8         A.    I believe it was 2004.

9         MR. FLEMING:  No further questions.          JUDGE

10   BAXTER:  Okay.

11        MR. MERICLI:  I just have --

12        MR. FLEMING:  I'm speaking of the affidavit up

13   here now (indicating).

14        JUDGE BAXTER:  Yes.

15        MR. FLEMING:  Okay.

16

17    RECROSS-EXAMINATION

18   BY MR. MERICLI:

19

20        Q.    Do you remember what was involved in this supposed

21   lawsuit from Colbert?

22        A.    Yes.

23        Q.    Were you served with a complaint?

24        A.    I don't recall.  What do you mean by complaint?

25        Q.    A complaint, Mr. Colbert versus Mr. Wittel and

1    others?

2         A.    Yes.

3         Q.    You saw a complaint?

4         A.    Yes.

5         Q.    A written complaint in federal court?

6         A.    Yes, not in court but --

7         Q.    The complaint was filed, it was purported to be

8    filed in federal court?

9         A.    Yes.

10         Q.    Did anybody take your deposition under oath?  Did

11    they take your testimony under oath?

12         A.    I don't recall.

13         Q.    You don't recall either Mr. Colbert paying for a

14    court reporter --

15              MR. FLEMING:  Objection.

16              JUDGE BAXTER:  Basis?  He hasn't finished his

17    question yet, but what's your basis?

18              MR. FLEMING:  He's leading too far away from this

19    chase.

20              JUDGE BAXTER:  So relevance?

21              MR. FLEMING:  Yeah, relevance.

22              JUDGE BAXTER:  Well, you opened the door.  You

23    asked the question, you opened the door.

24              MR. FLEMING:  All right.

25              JUDGE BAXTER:  So I'm going to overrule the

1    objection.

2            MR. FLEMING:  All right.

3    BY MR. MERICLI:

4        Q.    Are you are you aware of what a deposition is?

5        A.    If you could explain to me.

6        Q.    That may be my mistake, and I apologize.

7        A.    All right.

8        Q.    A deposition is when you take somebody's,

9    testimony, generally two lawyers or if somebody is

10   representing themself, they'll take somebody's testimony with

11   the court reporter acting as a person from the court and

12   putting them under oath and taking sworn statements just like

13   we are here today in court.

14           Did anything like that happen in this Colbert case?

15       A.    No.

16       Q.    You got written interrogatories in this case, from

17   Mr. Fleming?

18       A.    Yes.

19       Q.    From Mr. Fleming?

20       A.    Yes.

21       Q.    And he showed them to you here today?

22       A.    Yes.

23       Q.    In Colbert's case, did you get any interrogatories

24   like that?

25       A.    No.

1    Q.    All you really know about Colbert's case is that

2    he filed a complaint?

3    A.    Yeah.

4    Q.    And then like so many of these prisoners who write

5    cases, it just withered and died?

6    A.    Correct.

7    MR. MERICLI:  Okay, thank you.

8

9    FURTHER REDIRECT EXAMINATION

10   BY MR. FLEMING:

11

12   Q.    But do you remember seeing that document in front

13   of you --

14   MR. MERICLI:  Objection, asked and answered.

15   JUDGE BAXTER:  That's not what he said, Mr. Fleming.

16   He said he never saw it until this case.  He answered that 15

17   times.

18   MR. FLEMING:  All right.  I don't have anything.

19   JUDGE BAXTER:  Are you going to ask him something

20   else?

21   JUDGE BAXTER:  No, I'm done.

22   JUDGE BAXTER:  You're done?

23   MR. FLEMING:  Yeah.

24   JUDGE BAXTER:  You may step down, Officer Wittel.

25   THE WITNESS:  Thank you, ma'am.

1        JUDGE BAXTER:  Was that your last witness, Mr.

2    Fleming?

3        MR. FLEMING:  That's it.

4        JUDGE BAXTER:  Do you rest your case?

5        MR. FLEMING:  For today.

6        JUDGE BAXTER:  No, your case.

7        MR. FLEMING:  Yeah, I'm done, I rest my case.

8      JUDGE BAXTER:  Okay, Mr. Mericli?

9        MR. MERICLI:  I'd like to proceed to a verdict

10    stage in this case on the basis of the existing record.

11      JUDGE BAXTER:  All right, and is there any argument

12    you'd like to put forth at this time or would you like to wait

13    until morning to do that?

14      MR. MERICLI:  I'd be prepared to make an argument

15    right now.

16      JUDGE BAXTER:  Let's proceed to that, go ahead, I

17    have a half our.

18      MR. MERICLI:  Would you like me to begin?

19    JUDGE BAXTER:  Yes, sir.

20      MR. MERICLI:  I think that essentially the

21    failings in this case are twofold, factual and legal.  In

22    terms of the factual, I'd like to begin first and -- If I

23    could just have a moment to consult the statement of factual

24    and legal issues in dispute.

25      The evidence and testimony introduced here today,

1   without belaboring the point, I believe demonstrates that as a

2   matter of fact Mr. Tiller, a correctional counselor for the

3   department of corrections, then a sergeant of the department

4   of corrections, did not kick Mr. Fleming in the right ankle in

5   a failed effort to trip him.

6         JUDGE BAXTER:  By the way, this is the document we

7   did yesterday.  That's where he's going from, all right.

8         MR. FLEMING:  Yes.

9         JUDGE BAXTER:  All right.

10        MR. MERICLI:  I think -- I would invite the Court,

11  however, having done so myself on my VCR at home, to

12  scrutinize the segment one of the first tape very closely and

13  you will see, if you do, it goes by so quickly, it's just a

14  very brief preliminary.  But if you do, I found it best to

15  rewind it and look at it as it was rewinding.  There you will

16  see, unless my senses deceive me, that there is no contact of

17  any sort between Mr. Tiller and Mr. Fleming before Mr. Fleming

18  stumbles.  And then he immediately proclaims that he's been

19  the victim of an attempt to be kicked.  I believe that I saw

20  daylight there.  I believe that there was no extension of a

21  leg, there was no trip, there was nothing like that.

22        There's also a remark later on where someone says

23  you're limping on the wrong leg, you've gotten confused.  And

24  I think we know that Mr. Fleming is someone that at the very

25  least you may say about him, that he has a sense of humor and

1       he laughed in response to that.

2            The medical and nursing evaluations speak for

3       themselves.  You can look at Nurse Klos's examination.  It's a

4       textbook.  It could be used in a nursing school to portray how

5       to examine somebody who is complaining of those types of

6       injuries.

7            You heard from Physician's Assistant Telega.  It took

8       him a little while but he ultimately arrived at a diagnosis.

9       And he is, after all, a physician's assistant.  A diagnosis on

10      the 17th of May of malingering.  So that is the end of the

11      ankle.

12           Now moving on --

13           JUDGE BAXTER:  And the wrist.

14           MR. MERICLI:  And the wrist -- Moving on to the

15      wrist, the wrist does not have the benefit of a videotape.

16      But it would require -- Since Mr. Sullivan, Corrections

17      Officer Sullivan is accused of having done it at the same time

18      that he was videotaping the event, he would have had to nimbly

19      drop kicked the wicker pie slot shut, .and that would require

20      not only that manner of agility but also to do so while two

21      other members were attempting to disengaged handcuffs.  And

22      you would have to assume that not only he but Mr. Tiller are

23      lying about the event.  He wasn't the person who was suppose

24      to be involved or engaged.  He was doing something else.  We

25      know that.

1    The other point is the medical evidence is completely

2    -- it completely fails to substantiate that occurrence.  After

3    all you heard, when I cross-examined Mr. Fleming he said his

4    skin was abraded, there was blood, there was something like --

5    it wasn't a cut that required stitches but I got the sense

6    that he said it was cut and bleeding.  It wasn't cut and

7    bleeding and that certainly -- Unless everybody's lying in

8    some sort of massive conspiracy, Mr.  Telega and Mr. Klos

9    certainly didn't see anything involving blood.  So, in

10   addition to everything else ,that's the end of that.

11   Now, moving to the gate, unless this is Allison in

12   Wonderland's world, unless I am in some sort of psychotic

13   break, he kicked the gate shut.  The man did not shut the gate

14   on him, he kicked the gate shut.  And I don't think we need to

15   argue that anymore.  He didn't -- Nothing happened to him, he

16   did something to somebody else unless my senses deceive me.

17   Now, that concludes the excessive force presentation.

18   I would simply note as a final fill-in, that Judge

19   Hawkberg's -- Although in this case I think it would be

20   worthy, and I might invite attention only in the form of a

21   footnote that this is a matter of de minimus injury and de

22   minimus complaint of use of force anyway.  So legally

23   speaking, it probably didn't arise to that level.

24   However, I think obviously the prudent and best choice under

25   the circumstances was to try it as a matter of

1    fact.  We have done so now, so any -- And after all, Judge

2    Hawkberg's analysis is in fact out on a limb.  We don't know

3    how that's going to be treated by the third circuit.  It's a

4    novel and interesting concept to reconcile two different types

5    of laws.  But it is certainly fraught with potential for

6    rejection.  It might be interesting to use it in this case

7    because I think it could go up as an alternative analysis.  As

8    I suggested, there's a basis for a strong verdict, as a matter

9    of fact, that excessive force did not occur.

10        As for the retaliatory misconducts, the timing just

11    doesn't work to begin with.  He files -- He signs --

12    JUDGE BAXTER:  Am I missing something on the whole last

13    section?  Every single witness?

14        MR. MERICLI:  Yes.

15        JUDGE BAXTER:  It seemed to me that the answer was

16    consistent, and he was trying to elicit that answer.  I was

17    missing something.  I'll talk to him when he argues.  But was

18    I missing something.

19        MR. MERICLI:  That was the Camp Hill ones.  We can

20    begin with them if you like.  The thing about the Camp Hill

21    ones is, first, it's important to remember that I asked

22    Sergeant Kreider that for clarification.  They're not accused

23    of having retaliated against him for any lawsuit he filed in

24    Albion or for this lawsuit in general.  They were accused of

25    some kind of every day nondescript -- There was an event every

1    day, nondescript event that occurred in the SMU involving

2    Colbert beefing about a random cell search that happened.

3         At the time they had no idea that Colbert and Fleming,

4    that Fleming and Colbert had any friendship or relationship or

5    were talking to each other.  And nine days later they have a

6    completely unrelated misconduct -- After all, this is the SMU

7    -- that they give to Fleming.  Then subsequently Fleming says,

8    well, you know, I was -- you just did this because, you know,

9    I was one of Colbert's witnesses.  And he just said we had no

10   idea you were one of Colbert's witnesses and we don't know

11   anything about it.  Then, of course, he's attempting to get

12   them coming and going.  Once he says, at some point or another

13   you know -- Now you know I was Colbert's witness.  You get a

14   bit -- You get a lot of confusion there.

15        The simple fact is, at the time that he was banging on

16   the window and Kreider said go, Mr. Wittel or Jessie, go in

17   and check and see who's banging on the window and tell him to

18   quit it.  And he sees him sitting on the desk which is right

19   next to the window, and he sees him banging on the window.

20   And he says stop it three times and he doesn't stop it.  And

21   words are exchanged, so he writes him up.  And he comes back

22   and he puts down that Allen is with him and -- In that

23   arrangement, Kreider's an ear witness.

24        So they all are witnesses to some extent of what

25   happened.  Like every another case, each one is a building

1  block.  So they put it together.  At that time they had, you

2  know, they had no idea they're was going to be any argument

3  that there was some connection between that and something they

4  did nine days earlier when Colbert, who is across the hallway

5  from Fleming or at least shall we say, who's cell is located

6  in the approximate place, complained about random cell search.

7  They just didn't know about that.  And subsequently that was

8  raised as a chimera of sorts, of some sort of bugaboo that

9  was, that he conjures up.

10      As the Camp Hill gentleman made clear to us, you can't

11  work in a place like that and pay too much attention to people

12  threatening you with lawsuits because it happens so frequently

13  and so often that you just become desensitized.  There

14  couldn't have been a retaliation animus at Camp Hill because

15  basically he progressed through the SMU.  They didn't write

16  very many misconducts.  And none of them, including this one,

17  were for any anything particularly serious.  And he was a tier

18  worker a couple times which meant he was up to phase two.

19      What kind of retaliatory animus is that?  You get to be

20  one of their honest students.  That isn't much of a

21  retaliatory animus, and that's it as far as the Camp Hill

22  argument.

23      As far as Albion is concerned --

24          JUDGE BAXTER:  Any renewal of the argument about

25  default?

1    MR. MERICLI:  The default, I'm awfully sorry I

2 forgot that, that was the argument though.  That was made in

3 connection yesterday with the rule 52 (c).

4    JUDGE BAXTER:  About the Camp Hill --

5    JUDGE BAXTER:  That would be an alternative.

6 That's another problem when you think about the retaliatory

7 animus.  This man thought so little about it that he basically

8 let it wither and die on the vine.  He didn't appeal it in a

9 timely fashion.  If you look at Superintendent's denial of the

10 appeal in September 2003, he said, where have you been all

11 this time?

12    So that's not only a matter of procedural default as we

13 discussed yesterday under Al-Hafees and McKelvey, but it's

14 also a factual matter.

15    JUDGE BAXTER:  I see.

16    MR. MERICLI:  It makes you think, oh, how could

17 there be such a retaliatory animus because he forgot about the

18 whole thing for a couple months.

19    JUDGE BAXTER:  All right.

20    MR. MERICLI:  The Albion retaliatory misconducts I

21 think -- Well, first we can go with the ones that have to do

22 with him lying about the excessive force incidents.  The ones

23 written on him by Weaver and Robinson in the course of their

24 investigations.

25    The arguments I made before applies equally there.

1  Since in fact he was lying about those two excessive force

2  incidents, and we have demonstrated that he was lying about

3  those two excessive force incidents, even if I have a burden

4  of proof under Carter versus McGrady I think we have the

5  clarity of the demonstration of the misconduct, the conviction

6  of the misconduct, and the fact of the misconduct that is a

7  legitimate penal logical purpose and that that would discount

8  any retaliatory animus.

9       But I don't think there is a retaliatory animus, and

10  that's where the timing comes in that I was talking about that

11  a little bit earlier.  And the timing is his suit is signed

12  May 13th, but it isn't actually received by the United States

13  District Court until May 17th of 2002.  And it isn't actually

14  ordered served until May 22nd of 2002.  And the excessive

15  force incident happens on May 14th of 2002.  So, you can't be

16  -- It can't be retaliated against for a suit you haven't filed

17  yet, or that practically speaking no one could have known

18  about it.

19       Unless there was some evidence that they knew they

20  would -- that he was writing a particular lawsuit.  He could

21  be writing a habeas.  He could be writing on another civil

22  matter.  He could be writing a PCRA case.  He could be writing

23  on a direct appeal.  You don't know what he's doing legal

24  research on.  He could be working on a family law matter or

25  something.  They knew he was in the law library.  They didn't

1    know anything else.

2        And the other problem with that whole analysis was, who

3    was he suing?  He was suing the top brass at Albion.  All the

4    big names who were officials.  But he wasn't suing any of

5    these men.  So it doesn't make any sense.  The predicate for

6    causation for retaliation claim really just isn't there.

7        And the problem with the other retaliations, one

8    was on August 2nd and the other one was on August -- I guess

9    one was August 2nd, the broken handcuff key.  The problem with

10    that retaliation is the opposite.  It's too far away from the

11    suit.  It's in August.  The suit was in May.  Mr.  Maldonado

12    and Mr. Davison, correction officers, are not named in that

13    suit.  If you see, they're all named in the supplemental

14    complaint that's filed on September the 4th, 2002.  The first

15    in the series of supplemental complaints.  That's when they

16    come into the picture.

17        So all this stuff happened before they were involved.

18    And it's an extremely complicated matter to look at it and

19    unravel it.  And I apologize if I failed to do so sooner and

20    under the circumstances to its testament to the necessity for

21    a trial, that the Court proceed, that a trial in fact has made

22    in fact what is a murky case very clear.  But I think I've

23    made my point.

24            JUDGE BAXTER:  I understand your point.  In

25    rebuttal, in response, you may argue at this point.

1    MR. FLEMING:  All right.  I want to say due to the evidence

2    presented in this case by the plaintiff, me, the affidavits,

3    the signed statements, the medical reports, the examinations,

4    the videotapes, and also the witnesses that were not named as

5    parties that participated, it's evidence that I presented

6    enough for this case to proceed.   Their attorney statement

7    about procedural default, I mean he had years to make this

8    claim.  This is not the right time I feel to claim a procedure

9    default when you're suppose to make that at the earliest

10   possible stage.  And you know it's just -- Out of the three

11   prongs, two was clearly already met.

12         JUDGE BAXTER:  Of retaliation, that's correct.

13        MR. FLEMING:  Now the causal part is what I'm

14   explaining to you for this proceeding.  It clearly states, to

15   satisfy a third prong of a retaliation claim, this is a report

16   and recommendation, and therefore must allege a causal

17   connection between the exercise of his constitutional rights

18   and the defendants adverse actions.

19         JUDGE BAXTER:  Its causal connection.

20        MR. FLEMING:  Its causal connection.  Plaintiff's

21   allegations made clear that the filing of the complaint in

22   this matter and in the filing of a sworn affidavit, also the

23   interrogatories, the sworn statements, the testimony and other

24   things occurred within at least a temporal proximity of the

25   alleged adverse actions.                              JUDGE

1    BAXTER:   When that R and R was written I said your allegations

2    said that.   Now today you had to prove that.

3              MR. FLEMING:   Yeah.

4              JUDGE BAXTER:   So you're saying the testimony has

5    proven that?

6              MR. FLEMING:   This is what I'm saying, this is

7    what's been proven so far.

8              JUDGE BAXTER:   All right.

9              MR. FLEMING:   I would suggest a causal link to

10   sufficient -- to satisfy the third prong of the plaintiff's

11   retaliation claim.   As Mr. Mericli said, the Al-Hafees versus

12   McKelvey case, the burden is clearly on the defendant.

13        And I feel that this motion that he got in should be

14   denied and they present their evidence and show me what they

15   got and the Court.   That's all I got.

16             JUDGE BAXTER:   All right, thank you.   Well, I have

17   to slow up the videotape and look at it backwards, Mr.

18   Mericli?

19             MR. MERICLI:   Yes.   I want to emphasize in case I

20   left any misimpressions with Mr. Fleming that, you know, we

21   rested our case on the testimony of --

22             JUDGE BAXTER:   As well.

23             MR. MERICLI:   As well, as it developed in the --

24        JUDGE BAXTER:   That's what happens in situations when

25   you put the defendant's on the stand.   He has to ask them --

1    So both cases are kind of given at the same time.  So he rests

2    his case as well.

3         All right, I have to look through the information

4    and obviously do my job now, do my work.  We'll be adjourned

5    now until two o'clock tomorrow afternoon.

6         MR. FLEMING:  Two o'clock?

7         JUDGE BAXTER:  Pardon me?

8         MR. FLEMING:  Okay.

9         JUDGE BAXTER:  At which time I will render a

10   decision.

11        MR. MERICLI:  Thank you, your Honor.

12        (Off-the-record discussion.)

13        JUDGE BAXTER:  Back on the record.  I will strike

14   my order to return at two o'clock tomorrow, and instead I will

15   review the transcript of the proceedings as well in order to

16   render a verdict.  It will be rendered and findings of fact

17   and conclusions of law on paper and not in open court.

18        And so therefore, we will not meet tomorrow at two

19   o'clock.  I'll do it as quickly as I can.

20             (At which time, 4:25 p.m., the proceedings were
             concluded.)

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3              I,   Denice A. Grill, RMR, a Court Reporter and

4     Notary Public in and for the Commonwealth of Pennsylvania,   do

5     hereby certify that the foregoing is a true and accurate

6     transcript of my stenographic notes in the above-captioned

7     matter.

8

9

10    _____

11                 Denice A. Grill, RMR
                    Registered Merit Reporter
12

13

14              DATED:  _____

15

16

17

18

19

20

21

22

23

24

25